**FALCO et al.**

v.

**DONNER FOUNDATION, Inc., et al.**
No. 26, Docket 22756.

United States Court of Appeals
Second Circuit.

Argued Nov. 6, 1953.

Decided Dec. 8, 1953.

Morris J. Levy, New York City (William Rosenfeld, New York City, on the brief), for plaintiff-appellant-appellee.

Alfred Berman, New York City (Guggenheimer & Untermyer, Abraham Shamos, Norman Hammer, and Leon Tykulsker, New York City, on the brief), for Donner Foundation, Inc., defendant-appellee-appellant.

Dudley B. Tenney, New York City, for Pittsburgh Steel Co., defendant-appellee.

William H. Timbers, Washington, D. C. (Warren E. Burger, Asst. Atty. Gen., Edward H. Hickey and Oliver C. Biddle, Attys., Dept. of Justice, and J. Edward Lumbard, Jr., U. S. Atty., New York City, on the brief), for United States, intervenor-appellee.

William H. Timbers, Gen. Counsel, and Myer Feldman, Sp. Counsel, Washington, D. C., for Securities and Exchange Commission as amicus curiæ.

Before CHASE, Chief Judge, CLARK, Circuit Judge, and BRENNAN, District Judge.

CLARK, Circuit Judge.

These appeals arise from an action by Renzo Falco, stockholder, to recover alleged insider short-swing profits under § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), realized from purchase and sale of securities of the nominal defendant Pittsburgh Steel Company by defendant Donner Foundation, Inc.

On January 13, 1951, the beginning of the period covered by the complaint, Donner owned more than 10 per cent of Pittsburgh's Class A preferred stock. Throughout the period Donner was increasing its holdings in this stock and made a number of purchases at various dates.

Prior to January, 1951, Pittsburgh had accumulated dividend arrearages upon its Class A preferred stock in the amount of $50.625 per share. On January 8, 1951, it declared a dividend of $25 on this stock payable February 1 to stockholders of record as of January 19. This declaration was publicly announced and appeared in the financial press the next day.

Donner, in order to avoid recording the special dividend on its books as income and to facilitate the completion of

certain charitable donations from its principal to which it was committed, decided to undertake a capitalizing transaction. To this end it issued instructions to its brokers; and on January 19, the record day, it sold 2,000 shares bearing the right to receive the dividend, and simultaneously purchased 2,000 shares shorn of that right.

On February 26, 1951, Pittsburgh declared and publicly announced another special dividend of $26.625 per share, payable April 2 to stockholders of record March 16, thus completely eliminating the dividend arrearage. Donner again sought to capitalize the dividend, and on March 14 it simultaneously sold a total of 11,000 shares with dividend and purchased the identical number of shares ex dividend. On both January 19 and March 14, at the time of the simultaneous purchases and sales, the fluctuations of the market were such that the price of a share with dividend exceeded by a small amount the price of a share ex dividend, plus the value of the dividend. Accordingly Donner, in addition to realizing the value of the dividends in the form of capital gains, received an incidental profit after expenses in the amount of $14,258.59.

█ Plaintiff, being informed of these transactions, wrote Pittsburgh demanding that it institute proceedings against Donner to recover Donner's profits. Pittsburgh, after considering the matter, agreed with Donner that maximum liability was limited to $14,258.59; and the latter, while continuing to assert its nonliability, paid over that sum to it. Plaintiff, unsatisfied with this recovery, demanded that Pittsburgh make further claims; and after receiving Pittsburgh's refusal and waiting the required sixty days, he instituted this action. Since some of the transactions occurred in New York, venue was properly laid there. Securities Exchange Act of 1934, § 27, 15 U.S.C. § 78aa; Gratz v. Claughton, 2 Cir., 187 F.2d 46, certiorari denied 341 U.S. 920, 71 S.Ct. 741, 95 L. Ed. 1353, and see Goldstein v. Groesbeck, 2 Cir., 142 F.2d 422, 154 A.L.R. 1285, certiorari denied 323 U.S. 737, 65 S.Ct. 36, 89 L.Ed. 590.

Plaintiff asserts that Donner's transactions are purchases and sales within § 16(b), that the section is applicable regardless of the intent of the insider, and that the proper measure of damages, under Gratz v. Claughton, supra, 2 Cir., 187 F.2d 46, and Smolowe v. Delendo Corp., 2 Cir., 136 F.2d 231, 148 A.L.R. 300, certiorari denied Delendo Corp. v. Smolowe, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446, is to subtract the lowest purchases from the highest sales within six months without regard to intervening dividends or the simultaneous nature of some of the purchase and sale orders. Accordingly he matches Donner's sales against various purchases made between January 19 and June 5, and calculates liability, after deducting expenses and the sum already turned over, at $334,426.80. The court below, on cross motions for summary judgment, agreed that Gratz v. Claughton and Smolowe v. Delendo Corp., both supra, were controlling, and that the simultaneous nature of purchase and sale was to be disregarded. It, however, allowed $331,875 credit for the dividend and entered judgment for plaintiff for $2,551.80. Both plaintiff and Donner appeal.

We pass, as not well taken, certain procedural and constitutional objections raised by the parties and come at once to Donner's substantial claim that the Act is not here applicable. Section 16 (b) leads off with a clear statement of Congressional intent: "For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer [as defined in subd. (a)] by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any inten-

tion on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. * * *" Section 16(d), 15 U. S.C. § 78p(d), presents an exception: "The provisions of this section shall not apply to foreign or domestic arbitrage transactions unless made in contravention of such rules and regulations as the [Securities and Exchange] Commission may adopt in order to carry out the purposes of this section."[1] Since the transactions here involved do appear to come within the formal terms of subd. (b), we shall turn our attention at once to the exception of subd. (d) and hence to the nature and meaning of "arbitrage."

Arbitrage is nowhere defined in the statute. In ordinary usage it refers to a specialized form of trading which is said to be based upon disparity in quoted prices of the same or equivalent commodities, securities, or bills of exchange. In its most common form it involves purchase of a commodity against a present sale of the identical commodity for future delivery—time arbitrage; or a purchase in one market, say New York, against a sale in another, such as London—space arbitrage. There is also a third, somewhat less common, form—kind arbitrage. This consists of a purchase of a security which is, without restriction other than the payment of money, exchangeable or convertible within a reasonable time into a second security, together with a simultaneous offsetting sale of the second security. See Loss, Securities Regulation 589 and n. 426 (1951); 12 CFR § 220.4d(2),

cited infra note 3; Twentieth Century Fund, The Security Markets 209–210 (1935); Weinstein, Arbitrage in Securities 1, 2, 66–86 (1931); Heubner, The Stock Market 262, 283 (1922); Graham & Dodd, Security Analysis 543, 731 (3d Ed. 1951). Thus an arbitrager may buy warrants or rights to buy stock, simultaneously selling short the stock itself, and subsequently covering the short sale by exercising his right or warrant. It will readily be seen that for all practical purposes a convertible bond is equivalent to the number of shares of stock into which it is convertible. A right or warrant plus the subscription price is theoretically equivalent to the stock on which the right or warrant has a call. See Weinstein, op. cit. ch. IV.

Hence our example here bears all the earmarks of the arbitrage transaction. Thus, first, there is the same reliance on knowledge of existing price levels and their fixed relationship. It makes little difference whether such levels are related by the cost of storage or transportation, or by the current dollar-pound exchange rate or by the bond-stock convertibility ratio or by the amount of a declared, but not-yet-vested, dividend; in all cases the relative values are fixed, though relative prices may fluctuate. Next there is the same continuity of the arbitrager's position in the affected subject matter, which remains constant throughout the offsetting transactions. One who buys and sells a carload of wheat ends up where he started; so, too, does one who sells stock and covers the sale by buying bonds and converting them.[2] Finally the purchase and sale are simultaneous.[3] It matters not

1. The Commission, acting under this section, has adopted a rule to the effect that arbitrage profits realized by officers and directors must be turned over to the issuer. Rule X-16D-1, 17 CFR § 240.-16d-1. It has not extended this rule to 10 per cent stockholders, but in terms excludes them.

2. Since the present case involves only the issue presented by dividend arrearages we need not now decide whether or how promptly an arbitrager having converti-

ble securities, rights, or warrants must convert them in order to take advantage of the exception of § 16(d).

3. Section 4(d) of Regulation T, promulgated by the Federal Reserve Board and administered by the SEC under §§ 7(a) and 8 of this Act, 15 U.S.C. §§ 78g(a), 78h, as set forth in 12 CFR § 220.4d, which describes a "special arbitrage account" broadly enough to include the transactions here involved, goes on to indicate that the purchase and sale may

that the time of execution of the contracts may differ; it is enough that the arbitrager's rights and obligations under both purchase and sale contract are fixed at the same time. These principles are thoroughly established by the several authorities just cited. Although legal precedents to exemplify them are as yet lacking, they are in obvious accord with the reason of the exception made in the general statutory provisions.[4] For the very factors which identify arbitrage effectively insulate it from any wrongful use of inside knowledge. As we have seen, its distinguishing features are that matched and offsetting purchases and sales are executed simultaneously. The arbitrager's position in the issuer's security remains unchanged throughout his dealings. The transactions are based on knowledge of existing prices and hence devoid of any speculative element. Insider profits by their nature depend on public reaction over a measurable period of time to circumstances known in advance to the wrongdoer. But in acquiring the knowledge necessary for successful arbitrage, the insider is on the same footing with all the world, for his profit is not dependent on the policy or circumstances of the issuer, but on the coincident state of the markets. Indeed arbitrage is so clearly divorced from the abuses which § 16(b) seeks to prevent that an implied exception could be urged with some force even absent the express provisions of § 16(d).

■ Plaintiff argues that arbitrage requires an intent to profit by a price spread. In view, however, of the objective test imposed by § 16(b), the importing of such a requirement into the statute would be contrary to its general plan and inimical to its smooth opera-

tion. See Smolowe v. Delendo Corp., supra, 2 Cir., 136 F.2d 231, 235, 236, 148 A.L.R. 300. Nor is our result dependent on the incidental profit which Donner in fact realized; we cannot believe that Congress intended to exempt only the successful arbitrage and punish the bungler who showed no profit by leaving him open to the type of claim here asserted.

The contention that the transaction here involved lends itself to market manipulation and tax dodging does not strengthen plaintiff's case. "Wash sales," "matched orders," and other manipulative activities were outlawed by § 9 of the Act, 15 U.S.C. § 78i, and express penalties were provided. If an insider manipulates, he is liable under that section like anyone else. Section 16(b) purposes not to protect the public from manipulation, but to protect the stockholders and the corporation from an insider's profiting wrongfully at their expense. No amount of tax dodging, even if present, could be detrimental to the beneficiaries of the section.

■ In short we hold that simultaneous matched purchase and sale of identical or equivalent securities is arbitrage within the meaning of § 16(d) and hence removed from the thrust of § 16(b). If experience should prove that this holding is not sufficiently restricted, the Securities and Exchange Commission has full power to adopt contrary rules. Our conclusion, denying any recovery to the plaintiff, necessarily disposes also of the plaintiff's appeal attacking the computation of the recovery awarded below.

Reversed for summary judgment for defendant.

---

be "at as nearly the same time as practicable" or "at or about the same time." It is undisputed that the transactions here were simultaneous, and we need not consider how close a coincidence is required.

4. Neither Shaw v. Dreyfus, 2 Cir., 172 F. 2d 140, certiorari denied 337 U.S. 907,

69 S.Ct. 1048, 93 L.Ed. 1719, nor Park & Tilford, Inc. v. Schulte, 2 Cir., 160 F.2d 984, certiorari denied 332 U.S. 761, 68 S.Ct. 64, 92 L.Ed. 347, are in point, since in both a substantial interval and market movement separated the acquisition and disposal. These cases deal with the permissibility of certain forms of speculation, not arbitrage.