Isadore BLAU, Appellant,

v.

MAX FACTOR & COMPANY et al.,
Appellees.

No. 19202.

United States Court of Appeals
Ninth Circuit.

Feb. 24, 1965.

Robert Kenny, Kenny, Morris & Ibanez, Los Angeles, Cal., Morris J. Levy, New York City, for appellant.

Carl J. Schuck, Wayne H. Knight, of Overton, Lyman & Prince, Los Angeles, Cal., for appellee Max Factor & Co.

Samuel O. Pruitt, Jr., Herbert F. Sturdy, Francis M. Wheat, Gibson, Dunn & Crutcher, Los Angeles, Cal., for individual appellees.

Philip A. Loomis, Jr., Gen., Counsel, Walter P. North, Asso. Gen. Counsel, Jacob H. Stillman, Attorney, Sec. & Ex. Comm., Washington, D. C. for Sec. & Ex. Comm., amici curiæ.

Before BARNES, HAMLEY, and BROWNING, Circuit Judges.

BROWNING, Circuit Judge:

Appellant, a stockholder of Max Factor & Co., brought this action under section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78p(b),[1] to re-

cover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."

---

1. Sec. 16(b) reads:

"For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to re-

cover, on behalf of the corporation, profits said to have been realized by corporate insiders in a short-swing speculation in the company's Class A stock. The district court granted appellees' motion for summary judgment. We affirm.

Prior to 1947 Max Factor & Co. was a family corporation. In that year Max Factor Common stock was offered to the public. Class A stock was issued in the following year. It was created as a part of a plan to permit the company to pay maximum dividends to non-family stockholders while retaining earnings otherwise payable to the family stockholders (the appellees) for use in the business, without exposing the family stockholders to potential tax liability.

The Class A thus created had equal voting powers with the Common, rights on liquidation were the same, neither class was subject to redemption, and both were fully transferable. However, the board of directors was empowered to declare lesser dividends on Common than were declared on Class A.[2] Common was made exchangable for Class A at any time, and, as had been planned, substantially all of the public stockholders immediately exchanged their Common for Class A, while the appellees retained their Common.

Late in 1960 appellees decided to offer a portion of their stock interest to the public. On March 14, 1961, in contemplation of this public sale and in exercise of the right conferred by the company's certificate of incorporation, they exchanged 200,000 shares of their Common for an equal number of shares of Class A. They sold the latter to the public on April 18, 1961.

The Common involved in the exchange had been acquired by appellees from five to thirty-two years earlier. No appellee acquired Class A within six months of the sale,. except by the exchange. This suit was brought to recover the "profit" which resulted from an increase in the market price of Class A during the month between the exchange and sale.

Concededly appellees are corporate insiders of Max Factor & Co., subject to section 16(b). Concededly they made a "sale" of Class A less than six months after acquiring the Class A in exchange for Common. However, the district court concluded that the exchange of Common for Class A was not a "purchase" of the Class A within the meaning of section 16(b). We agree.[3]

■ The statutory definitions of "purchase" and "sale" are exceedingly gener-

---

Sec. 16(b) applies to the same persons as § 16(a), that is, "Every person who is directly or indirectly the beneficial owner of more than 10 per centum of any class of any equity security (other than an exempted security) which is registered on a national securities exchange, or who is a director or an officer of the issuer of such security * * * ".

For the purpose of their motion for summary judgment, appellees concede that they are members of the class to which § 16(b) applies.

2. At all relevant times appellees owned more than 75% of the voting stock, and constituted more than a majority of the board of directors. They were therefore able to determine whether and to what extent the power to declare lesser dividends on their Common would be exercised. Dividends declared on Common were in fact materially below those paid on Class A.

3. The district court also held that the transaction was excluded from § 16(b) by Securities Exchange Commission Rule 16B-9, issued by the Commission some four months after the filing of this action. Rule 16B-9 purports to exempt from the operation of § 16(b) the exchange of shares of one class of stock for shares of another of the same corporation, pursuant to a right of conversion granted by the company's charter, if (1) the classes of shares exchanged evidence substantially the same rights and privileges except that the board of directors may declare a lesser dividend on the class surrendered than on that acquired; and (2) the exchange was effected in contemplation of a public sale of the shares acquired. The rule was expressly made retroactive. 17 C.F.R. § 240–16b–9 (1963).

Since we decide that § 16(b) was in any event inapplicable, we do not consider the applicability and validity of Rule 16B-9.

al.[4] They are given specificity by measuring questioned transactions against the purpose of section 16(b). Thus, a transaction is held to be a "purchase" within section 16(b) "if in any way it lends itself to the accomplishment of what the statute is designed to prevent." Blau v. Lehman, 286 F.2d 786, 792 (2d Cir. 1960), aff'd 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962). See also Park & Tilford v. Schulte, 160 F.2d 984 (2d Cir. 1947). On the other hand, to avoid purposeless harshness, a transaction is held not to be a section 16(b) "purchase" if it "was not one that could have lent itself to the practices which Section 16(b) was enacted to prevent." Ferraiolo v. Newman, 259 F.2d 342, 346 (6th Cir. 1958). See also Roberts v. Eaton, 212 F.2d 82, 85–86 (2d Cir. 1954); Shaw v. Dreyfus, 172 F.2d 140, 142 (2d Cir. 1949). Cf. Blau v. Mission Corp., 212 F.2d 77, 80 (2d Cir. 1954) ("sale"); Falco v. Donner Foundation, 208 F.2d 600, 604, 40 A.L.R.2d 1340 (2d Cir. 1953).[5]

The initial inquiry must therefore be: What is the purpose of section 16(b) —what practices is the statute designed to prevent?

As section 16(b) itself states, its general purpose is to preclude the "unfair use of information which may have been obtained by" corporate insiders, in trading in the securities of their corporation. But Congress did not seek to accomplish the whole of this purpose by section 16(b) alone. Section 16(b) creates a special remedy, applicable only in a limited situation. Absolute liability is imposed,[6] but only when the insider both acquires and disposes of securities of his corporation "within any period of less than six months." When acquisition and disposition are separated by a longer period section 16(b) is inapplicable; other remedies are then available, but only upon proof of actual wrongdoing.[7]

The fact that section 16(b) was intended to apply only to insider "short-term speculative swings" is confirmed by legislative history,[8] and has been often remarked by the courts.[9]

4. Sec. 3(a) (13), 15 U.S.C.A. § 78c(a) (13) provides: "The terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire."

Sec. 3(a) (14), 15 U.S.C.A. § 78c(a) (14) provides: "The terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of."

5. It has been suggested that as to conversions the statute should be applied broadly, "leaving it to the Securities and Exchange Commission to make appropriate exemption for transactions which fall within the letter of the statute but not its spirit." Meeker & Cooney, 45 Va.L.Rev. 949, 964–965 (1959). However, the primary duty of administering § 16(b), unlike other provisions of the Act, is not imposed upon the Commission, but upon the courts through the medium of stockholder suits. Moreover, the Commission has been slow to exercise its power of exemption. In these circumstances, whether § 16(b) is to have a flexible or mechanistic application in practice must depend upon the courts.

6. The insider is required to relinquish his profits, even though he did not enter into the stock transactions with the intention of speculating, and did not utilize, or even possess, confidential corporate information. See B. T. Babbitt, Inc. v. Lachner, 332 F.2d 255, 257 (2d Cir.1964); Rheem Mfg. Co. v. Rheem, 295 F.2d 473, 475 (9th Cir.1961); Blau v. Lehman, 286 F. 2d 786, 791 (2d Cir.1960), aff'd 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962); Smolowe v. Delendo Corp., 136 F.2d 231, 235–236, 148 A.L.R. 300 (2d Cir.1943); Comment, 11 Stan.L.Rev. 358 (1959); Meeker & Cooney, 45 Va.L.Rev. 949, 951–952 (1959); Yourd, 38 Mich.L.Rev. 133, 145 (1939); 2 Loss, Securities Regulation 1041 (2d ed. 1961).

7. See generally, 2 Loss, Securities Regulation 1123–1124 (2d ed. 1961); 3 Loss, Securities Regulation, 1455–1474 (2d ed. 1961); Yourd, 38 Mich.L.Rev. 133, 139–143 (1939).

8. See particularly, Stock Exchange Practices, Hearings before the Senate Committee on Banking and Currency, 73rd Cong., 1st Sess., pt. 15 at 6557–6558 (1934).

9. B. T. Babbitt, Inc. v. Lachner, 332 F.2d 255, 257–258 (2d Cir.1964); Kornfeld v. Eaton, 327 F.2d 263, 264–265 (2d Cir. 1964); Rheem Mfg. Co. v. Rheem, 295

The reasons which led Congress to declare insider profits on stock transactions forfeit only when purchase and sale both occurred within less than six months, though not spelled out in the legislative materials, are nonetheless clear. Improper use of inside information by corporate insiders is most likely to occur in short-term, in-and-out trading. The temptation to trade upon inside information is enhanced when the period for which capital must be committed is short. And ordinarily the useful life of "confidential" inside information is brief.[10] The evidence upon which Congress acted indicated that the abuse occurred almost entirely in short-swing transactions. Moreover, few if any reasons could be advanced for encouraging such trading by insiders. On the other hand, in long-term investment the risk of abuse of inside information was relatively slight, and the affirmative value of long-term personal financial commitments by insiders to the prosperity of the companies which they controlled was obviously great. Thus, by basing forfeiture of profits upon the length of the insider's investment commitment, Congress sought to minimize misuse of confidential information, without unduly discouraging bona fide long-term investment.[11]

■ Appellees' investment commitment in Max Factor & Co. was a long term one, undertaken, as we have noted, many years prior to their exchange of Common for Class A. The exchange of Class A for Common did not interrupt the continuity of appellees' investment: it did not increase or decrease the amount invested, or alter in any way the risk assumed long years before. Moreover, since there was no speculative advantage in holding Class A rather than Common, the exchange conferred no opportunity for speculative profit which appellees did not already enjoy. Thus, appellees made only one investment decision in the six months' period—the decision to terminate their long-term investment by sale.[12] The exchange was in reality only a step in the process of sale—and an unnecessary one at that, for Common was as marketable as Class A and at precisely the same price.[13]

F.2d 473, 475 (9th Cir.1961); Blau v. Lehman, 286 F.2d 786, 792 (2d Cir.1960), aff'd 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed. 2d 403 (1962); Ferraiolo v. Newman, 259 F.2d 342, 344 (6th Cir.1958); Roberts v. Eaton, 212 F.2d 82, 85 (2d Cir. 1954); Shaw v. Dreyfus, 172 F.2d 140, 142 (2d Cir. 1949).

10. As the Commission has pointed out, "In and out trading greatly magnifies the possibility of profit from inside information in relation to a given amount of capital and makes such profit [all] the more unfair because of the relatively risk-free character of a short-term commitment which the insider may make in anticipation of a favorable market development." Securities Exchange Act Release No. 4509 (1950), CCH Fed.Sec.L.Rep. '48–'52 Decisions, par. 76080.

11. Securities Exchange Act Release No. 4509 (1950), CCH Fed.Sec.L.Rep. '48–'52 Decisions, par. 76080, quoted in part in Kornfeld v. Eaton, 217 F.Supp. 671, 676–677 (S.D.N.Y.1963); Roberts v. Eaton, 212 F.2d 82, 85 (2d Cir.1954); Steinberg v. Sharpe, 95 F.Supp. 32, 34 (S.D.N.Y.1950), aff'd on opinion below 190 F.2d 82 (2d Cir.1951); Truncale v. Blumberg, 88 F.Supp. 677, 679 (S.D.N.Y. 1950), aff'd on opinion below, sub nom. Truncale v. Scully, 182 F.2d 1021 (2d Cir. 1950); Note, 63 Colum.L.Rev. 1518, 1521 (1963); Meeker & Cooney, 45 Va.L.Rev. 949, 963–964 (1959); Comment 59 Yale L.J. 510, 511 (1950); Hardee, 65 Harv. L.Rev. 997, 1007 (1952).

12. Cf. Blau v. Ogsbury, 210 F.2d 426 (2d Cir.1954).

13. Class A was registered or "listed" on a national exchange under the Securities Exchange Act of 1934, and Common was not, but all shares of Class A issuable for exchange for outstanding shares of Common were also registered on the national securities exchange for listing on notice of issuance. Since there was an unrestricted right to exchange Common for Class A share for share at any time, and the latter would automatically be listed on the national securities exchange as soon as issued, Common and Class A were equally marketable. The evidence was undisputed that brokers accepted Common for sale at the market price for Class A, completing the exchange before delivery to the purchaser.

Thus, the making of the exchange, and its timing, were simply irrelevant to the use of insider information in short-term speculation—the problem with which section 16(b) is concerned. If appellees acted upon inside information in disposing of their stock interest when they did, the exchange was unrelated to that fact—they could have done so quite as well, at exactly the same time, realizing precisely the same profit, without converting their Common to Class A at all. So also the nature, duration, and amount of their investment, the temptation and opportunity to trade on inside information, and the profit to be had by doing so, would all have been the same had the exchange been accomplished six months or more before the sale. In these circumstances, to hold that the exchange of Common for Class A constituted a "purchase" within section 16(b) would ignore the distinction which Congress drew between long-term investment and short-term speculation.

Appellant places primary reliance upon Park & Tilford v. Schulte, 160 F.2d 984 (2d Cir. 1947). While the broad language of the opinion in that case would support a decision that the appellees' exchange of Common for Class A constituted a section 16(b) "purchase,"[14] the holding does not. The preferred and common exchanged in Park & Tilford involved significantly different investment risks. For this and other reasons, the decision to exchange the convertible security required an investment decision within the six months' period distinct from the decision to sell the

converted security—a new investment risk was undertaken, and a new, if limited, opportunity was presented to realize profit, or avoid loss, through the use of insider information.[15]

Affirmed.

When appellees exchanged their Common for Class A, neither were registered (or exempt) under the Securities Act of 1933, and since appellees occupied a "control" relationship to the company, they could not transfer stock of either class to the general public without registering it under the 1933 Act. Since they exchanged their Common for Class A before making a public sale they registered only the Class A, but they might have registered the Common as readily.

14. Thus the court stated, "Defendants did not own the common stock in question before they exercised their option to convert; they did afterward. Therefore they acquired the stock, within the meaning of the Act." 160 F.2d at 987.

15. Laufer, 8 N.Y.L.F. 232, 243 (1962); Note, 107 U.Pa.L.Rev. 719, 725 n. 30 (1959); Note 45 Va.L.Rev. 123, 126 n. 19 (1959); Meeker & Cooney, 45 Va.L. Rev. 949, 962–963 (1959); Comment, 59 Yale L.J. 510, 526 (1950). But see Comment, 11 Stan.L.Rev. 358, 361–365 (1959).