**Isadore BLAU, a stockholder of Air-Way Industries, Inc., suing on behalf of himself and all other stockholders similarly situated and on behalf and in the right of Air-Way Industries, Inc., Plaintiff,**

v.

**Edward LAMB, Edward Lamb Enterprises, Inc., Dorothy K. Oswald, Executrix under the Last Will and Testament of Frank C. Oswald, deceased, Air-Way Industries, Inc., and Edward Lamb Foundation, Inc., Defendants.**

United States District Court
S. D. New York.
May 5, 1965.
Supplemental Opinion June 5, 1965.

Morris J. Levy, New York City, for plaintiff.

Stember & Dershowitz, New York City, Jerome M. Stember, New York City, of counsel, J. Eugene Farber, Toledo, Ohio, for defendants.

TYLER, District Judge.

Isadore Blau, a stockholder of Air-Way Industries, Inc. ("Air-Way"), brings this action under Section 16(b) of the Securities Exchange Act of 1934, (15 U.S.C. § 78p(b)), to recover for the corporation "short-swing" profits realized in 1955 and 1956 by insiders of Air-Way.[1] Trial was had before this court, sitting without a jury, on February 4, 10 and 11, 1965, and proposed findings of fact and conclusions of law have been submitted by the parties. In compliance with Rule 52 (a), F.R.Civ.P., this opinion shall constitute the court's findings and conclusions.

The two principal defendants in this action are Edward Lamb, an Air-Way insider by virtue of his position as a director and member of the corporation's executive committee, and Edward Lamb Enterprises, Inc. ("Enterprises"), an Ohio corporation wholly owned by Lamb and the members of his family. Enterprises has served as a holding company for the Lamb family interests and qualifies as an Air-Way insider by virtue of its beneficial ownership of more than ten per cent of the outstanding common stock of Air-Way. The latter is a Delaware corporation with its common stock listed on the American Stock Exchange. Air-Way was named as a defendant after refusing plaintiff's demand that it commence this action.[2]

Plaintiff claims that Lamb and Enterprises realized profits from purchase and sale transactions in both the common and the preferred stock of Air-Way. Because of the novelty of the questions raised by the preferred stock transactions, they constitute the major area of dispute in this action. The claim on the common stock transactions, although involving a not insubstantial amount of damages, is comparatively less complex and will be dealt with separately hereinafter.

### I. PREFERRED STOCK TRANSACTIONS

The following essential facts illuminate and bear upon the issues of short-

---

1. That Blau has sufficient indicia of ownership to bring this action has already been decided, Blau v. Lamb, 314 F.2d 618, (2d Cir. 1963).

2. The two remaining named defendants, Edward Lamb Foundation, Inc., and Dorothy K. Oswald, Executrix under the Last Will and Testament of Frank C. Oswald, deceased, have been dropped as parties by stipulation.

swing profits allegedly realized on the Air-Way preferred stock.

On June 9, 1955, Air-Way offered the stockholders of Lamb Industries, Inc. ("Industries"), an exchange of one share of its newly-created convertible preferred stock for every five shares of Industries' common stock. Industries then was an Ohio manufacturing corporation.[2a] At the time this offer of exchange was made, Edward Lamb was the president and treasurer of Industries and controlled 97% of its stock—which was never listed on any exchange and had no fixed market value. Various employees of the corporation and residents of Middleville, Michigan, where Industries' plant was located, owned the remaining 3%.

Shortly thereafter, Lamb and Enterprises began a series of transactions in which, almost simultaneously, they exchanged their holdings of Industries common for Air-Way preferred stock and then exercised their options to convert the Air-Way preferred thus acquired into Air-Way common stock at the rate of 3½ shares of Air-Way common for each share of Air-Way preferred. All exchanges and conversions took place within three months and were completed by September 15, 1955.

■ Plaintiff contends—and I am persuaded—that the exchange of Industries common for Air-Way preferred was a "purchase" and that the subsequent conversion of Air-Way preferred into Air-Way common was a "sale", giving rise to a "profit" computed by substracting the value of the Industries stock surrendered on the date of exchange from the value of the Air-Way common received on the date of conversion, all within the meaning and intent of Section 16(b).

■ The mere fact that no cash changed hands does not preclude a finding that the exchange of Industries stock for Air-Way preferred constituted a "purchase". Stella v. Graham-Paige Motors Corp., 132 F.Supp. 100 (S.D.N.Y. 1955), aff'd, 232 F.2d 299 (2d Cir. 1956) (exchange of assets for stock). Indeed, at least two other cases in this district, Fistel v. Christman, 135 F.Supp. 830 (S.D.N.Y.1955) and Blau v. Hodgkinson, 100 F.Supp. 361 (S.D.N.Y.1951), clearly support plaintiff's contention that the exchange was a "purchase".

In Fistel, Judge Weinfeld found a "purchase" where the insider of company A acquired additional shares of company A by giving in exchange the shares of company B. Company B resembled Lamb Industries in that it was a closely held corporation whose shares were never actively traded. The insider held 90% of its stock.[3]

In Hodgkinson, pursuant to a plan of corporate simplification, the insider of the subsidiary corporation gave up his shares in the subsidiary and received shares of the parent corporation in exchange. Finding this transaction to be a 16(b) purchase, Judge Leibell explained:

"Under the plan for the corporate simplification, a stockholder of one of the subsidiaries was not obliged to accept stock of Federated for his stock in the subsidiary. He could have demanded the cash value of his stock in the subsidiary * * *. When the defendants turned over their stock in a subsidiary and received stock in Federated, they received something totally different from that which they surrendered— stock in a different corporation * * *." Blau v. Hodgkinson, supra, 100 F.Supp. at p. 373.

Turning to the conversion half of the transaction, the case most heavily relied upon by plaintiff to support his claim that

---

2a. On December 31, 1958, Air-Way changed its name to Lamb Industries, Inc. Thus, to avoid obvious confusion, throughout this opinion reference is made to Air-Way and Industries as they existed as separate companies during the relevant period in 1955.

3. No liability was imposed in Fistel, however, since on the basis of expert testimony as to stock valuation, Judge Weinfeld determined that no profit had been realized upon sale of the stock thus acquired.

the conversion of Air-Way preferred into Air-Way common constituted a 16(b) "sale" is Park & Tilford, Inc. v. Schulte, 160 F.2d 984 (2d Cir. 1947). In that case, defendants owned a majority of the outstanding common stock and, in addition, a large block of preferred shares, convertible at the rate of $1\frac{1}{4}$ shares of common for each share of preferred, and redeemable by the corporation at $55 per share on 30 days notice. During a period in which the market price of the common rose steadily due to a rumor about a possible dividend to be paid in cases of liquor, the corporation gave notice that it would redeem the preferred. Thereupon defendants converted their preferred into common before the redemption date at a time when the market price of common stood at $58 per share. Defendants then sold the common within six months. The court, relying upon a literal interpretation of the statute which broadly defines "purchase" as "any contract to buy, purchase, or otherwise acquire", ruled (at p. 987): "We think a conversion of preferred into common stock followed by a sale within six months is a 'purchase and sale' within the statutory language of § 16(b)."

Although Park & Tilford is clear authority for treating a conversion as a "purchase" of the security received, the interesting problem confronted here is the determination whether the conversion may also be considered a "sale" of the convertible security. Logically within the purview of the statute, it would seem that every transaction which can be labeled a "purchase" so far as the purchaser is concerned necessarily should be viewed as a "sale" from the standpoint of the other party to the same transaction. Moreover, the danger of insider speculation is no less inherent in a situation where a conversion serves as the second half of the short-swing than where a conversion constitutes the first half or "purchase" end of the short-swing. This view was recently taken in Heli-Coil Corp. v. Webster, 222 F.Supp. 831 (D.C. N.J.1963). In that case, defendant purchased convertible debentures, converted them into common stock within six months, and then sold some of the common within six months thereafter. Judge Augelli determined that the conversion constituted *both* a "sale" of the debentures and a "purchase" of the common stock, thus sustaining the plaintiff's contention that the purchase-conversion-sale transaction constituted two separate 16(b) violations.

Notwithstanding Park & Tilford and Heli-Coil Corp., Chief Judge Jones held in Ashland Oil and Refining Company v. Newman, 163 F.Supp. 506 (N.D. Ohio 1957), aff'd,[3a] 259 F.2d 342 (6th Cir.), cert. denied; 359 U.S. 927, 79 S.Ct. 606, 3 L.Ed.2d 629 (1958), that not all conversions are transactions within the meaning of the Act. Defendant, a director of Ashland held convertible preferred shares. When the corporation announced that it would redeem the stock at $27 per share, he and all other preferred shareholders decided to exercise the right to convert to common which, at the time, was selling at $36 per share. Judge Jones held that this particular conversion was not a Section 16(b) purchase. He distinguished the case from Park & Tilford on substantially the following grounds: (1) the conversion was largely involuntary in view of the difference between the redemption price of the preferred and the market price of the common; (2) the shares received were almost the economic equivalents of the shares exchanged, both in price and in marketability, because of a provision protecting the convertible preferred against dilution and because both the preferred and the common were listed securities actively traded on national exchanges; (3) Newman was a director who had no controlling interest in the corporation and did not actively participate in corporate affairs.

Despite these distinctions, commentators have suggested that the Ashland Oil case may limit the scope of Park & Tilford as a precedent for applying 16

---

**3a.** Sub nom. Ferraiolo v. Newman.

(b) to securities conversions. See 72 Harv.L.Rev. 1392 (1959). As is apparent from Judge Augelli's opinion in Heli-Coil, however, it might be more accurate to observe that the Ashland Oil case brings to conversion transactions the same flexible approach consistent with Section 16(b)'s purpose as has been long employed by the courts in varying factual patterns to construe the essential statutory concepts of "purchase" and "sale". This approach has been characterized as "pragmatic rather than technical", Ferraiolo v. Newman, 259 F.2d 342, 344 (6th Cir. 1958), and the test, succinctly stated, is whether or not the transaction in question in any way "lends itself to the accomplishment of what the statute is designed to prevent." Blau v. Lehman, 286 F.2d 786, 792 (2d Cir. 1960), aff'd, 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962).

On the basis of the evidence produced at trial, I am of the opinion that the preferred stock transactions engaged in here were the kind sought to be proscribed by the statute. The element of involuntariness, so crucial to the decision in the Ashland Oil case, was totally absent here. Unlike the "insider" in Ashland Oil, Edward Lamb was in full control of the corporation whose shares were traded; indeed, he was the guiding force behind the plan of exchange between Air-Way and Industries. Significantly, this plan had never been discussed at a board meeting of Air-Way prior to June 9, 1955—the date resolutions embodying the offer of exchange were proposed and passed by the directors, all of whom were Lamb's nominees. Lamb testified that the immediate purpose of the exchange was to graft on to Air-Way the same team of management experts he had previously recruited for Industries in an effort to radically alter and bolster what he considered to be Air-Way's then inadequate and misguided sales program. In addition, the exchange of Industries stock for Air-Way preferred and the subsequent conversion of the latter into common stock served Lamb's long-range goal of acquiring dominance of Air-Way. It re-

quires little imagination to infer from such factors a corporate milieu rife with opportunities for speculation and misuse of inside information.

The speculative nature of the preferred stock transactions become even more suspect in light of the fact that the "outsider" stockholders of Air-Way were not given an opportunity to signify their approval of the exchange with Industries until the next annual meeting, March 27, 1956—more than six months after the last conversion. By this date, as a result of exchange and conversion—in addition to over-the-counter purchases—Lamb and his family had increased their holdings of Air-Way common to approximately 52%.

Throughout the protracted history of this litigation, defendants have emphasized the importance of a provision in the preferred certificates which, like a similar provision attaching to the Ashland Oil securities, protected the preferred against the diluting effect of any possible split or stock dividend on the common stock by providing for a proportionate adjustment in the conversion rate. Thus, defendants argue, the Air-Way preferred was the economic equivalent of the Air-Way common, and the conversion of the preferred did not interrupt the continuity of their investment in Air-Way—i. e., the disposition of the preferred by conversion did not constitute a "sale".

The simple answer to this argument is that this anti-dilution feature did not place a holder of the preferred stock in precisely the same investment position as a holder of common stock. On the contrary, by conversion, Lamb and Enterprises significantly enhanced their investment position in three important respects: (1) greater voting power, (2) greater dividends and (3) greater marketability of their shares. As the preferred and the common each entitled the holder to one vote, conversion at the rate of 3½ to one gave defendants 3½ times greater voting power. During the period between the first exchange and the last conversion, dividends on 3½ shares of common exceeded the dividend on one

share of preferred by more than forty cents. As for marketability, unlike the common stock, Air-Way preferred was a new issue, not listed upon any exchange, and without any fixed market value.[4]

On the other hand, in apparent contradiction of his counsel's argument that the preferred was the economic equivalent of the common, Lamb testified upon cross-examination that, although he knew he was giving up valuable preferences when he converted, " * * * I felt that I should have the same status as the other stockholders * * *."

Thus, irrespective of the anti-dilution feature of the preferred, the latter was simply not the economic equivalent of the common stock. By converting the preferred, Lamb and Enterprises received a totally different security with an attendant alteration in the risks and advantages involved. To put this another way, conversion into common stock required an investment decision based upon wholly different considerations than those involved in the decision to exchange for the preferred stock. I conclude, therefore, that the conversion of Air-Way preferred into Air-Way common constituted a "sale" within the meaning of Section 16(b) and, consequently, a violation of that section.[5]

## II. COMMON STOCK TRANSACTIONS

■■ It was stipulated in the pre-trial order entered in this action that Edward Lamb sold 300 shares of Air-Way common through the American Stock Exchange on September 15, 1955. The sale of these shares constituted a statutory violation when matched with purchases made less than six months earlier on March 18 (200 shares) and March 22, 1955 (100 shares). Another violation in the nature of a "sale-purchase" swing, arose from the purchase through the Exchange of 100 shares on October 6, 1955, when matched with these prior sales of September 15. (pre-trial order, page 3, paragraphs 9 and 12.)[6]

In private sales, not consummated on the Exchange, defendant Enterprises sold 10,500 shares of Air-Way common on or about October 6, 1955, and 6,500 shares on or about October 13, 1955. (pre-trial order, page 5, paragraph 17.) Plaintiff contends—and defendants deny —that a transaction between Enterprises and Industries on or about June 6, 1955, constituted a "purchase" against which these two subsequent sales can be matched to establish Section 16(b) violations.

In this particular transaction of June 6 (pre-trial order, page 16, paragraph 12). Enterprises acquired from Industries 68,100 shares of Air-Way common, plus other assets. Industries received in exchange 40,002 shares of Industries common stock, plus the assumption by Enterprises of a note in the sum of $581,250 given by Industries to the Chemical Corn Exchange Bank.

Defendants' argument addressed to this transaction—that the exchange constituted no more than "a mere transfer between corporate pockets"—rests entirely upon Judge Clark's opinion in Blau v. Mission Corp., 212 F.2d 77 (2d Cir. 1954). In that case, defendant Mission Corporation organized a subsidiary, Mis-

4. Cf. Blau v. Max Factor & Co., 342 F.2d 304 (9th Cir. decided Feb. 24, 1965), where the exchange or conversion of common stock—acquired at least five years earlier—into Class A stock was held not to be a Section 16(b) "purchase" after a finding that the common was as marketable as the Class A, at precisely the same price, and that brokers readily accepted common for sale at the market price for Class A.

5. There is no merit in Lamb's contention that at least a portion of the Air-Way preferred stock he converted is exempt from the operation of Section 16(b) because he had acquired some of the Industries stock used in the exchange pursuant to an employee restricted stock option plan meeting the requirements of Rule X-16(b)-3 of the Securities Exchange Commission.

6. See Heli-Coil Corp. v. Webster, supra, for the proposition that the same transaction may be paired with both a prior and a subsequent transaction, thereby giving rise to two separate 16(b) violations.

sion Development Company, purchased a substantial amount of Tide Water Associated Oil Company shares, and then, in two separate transactions, transferred the Tide Water stock to Development in exchange for stock in the latter company. The first exchange took place shortly after the incorporation of Development and resulted in Development holding the Tide Water stock as its sole asset and Mission holding all of the outstanding Development shares. By the time the second exchange took place, however, Mission had disposed of some of its stock in Development so that 1.8 million of the 2.8 million then outstanding Development shares were publicly held. While holding the second exchange to be a "sale" within the meaning of 16(b), Judge Clark declined to so hold as to the first transaction, which he characterized as "a mere transfer between corporate pockets", or "mere bookkeeping", since there was then "no existing market for Development stock and no public ownership of its stock, which was entirely held by its parent." (212 F.2d, at page 81).

The analogy which defendants seek to draw between the first Mission Corp. exchange and the June 6 transaction between Industries and Enterprises is inapposite. The 3% of Industries' stock held by outsiders—approximately 6,000 out of 196,000 shares—cannot be cavalierly dismissed, the way defendants suggest, as "insignificant".[7] In practical effect, defendants seek to extend the exemption for an exchange between a parent and a 100%-owned subsidiary to an exchange with a 97%-owned subsidiary without offering any precise and generally applicable criteria for guidance in future cases. It can be said, moreover, that Judge Clark's ruling on the first exchange in the Mission case was influ-

enced by the fact that the transaction was merely part of the process of setting up the newly-organized subsidiary. In short, unlike Enterprises' subsidiary, Development had no assets of its own until the first exchange.

■ It must be concluded, thus, that the exchange on June 6, 1955 was a "purchase" by Enterprises of 68,100 shares of Air-Way common which can be matched against Enterprises' subsequent sales of 10,500 and 6,500 shares, respectively, on October 6 and 13, 1955.

■ Finally, Enterprises realized an additional profit, as a result of statutorily proscribed "sale-purchase short-swing" by its purchase of 100 shares through the American Stock Exchange on October 16, 1955—ten days after the October 6 sale at a higher price per share. (pretrial order, page 4, paragraph 15.) Additional violations arose from purchases by Enterprises through the American Stock Exchange within six months prior and subsequent to a transaction between Enterprises and former defendant Frank C. Oswald on or about November 2, 1956.[8]

### III. JURISDICTION AND VENUE

Jurisdiction of this action is conferred upon this court by virtue of Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa.

■ That neither defendant is a resident of or was served with process in the Southern District of New York is of no consequence. Grossman v. Young, 70 F.Supp. 970 (S.D.N.Y.1947). As to each defendant, venue is properly laid in this District because of common stock transactions on the American Stock Exchange which constituted violations of Section 16(b).[9] The sale by Edward Lamb of 300 shares of Air-Way through the Ex-

7. Actually, Enterprises' direct ownership of Industries amounted to only 87.94%. The 97% figure represents the Lamb family's holdings in Industries from all sources.

8. Pre-trial order, page 6, paragraph 17(c). Although defendants, in the pre-trial order, denied that this transaction was a

sale of Air-Way stock by Enterprises to Oswald, plaintiff submitted uncontradicted evidence in support of his contention at trial.

9. The venue portion of 15 U.S.C. § 78aa permits an action to be brought "in the district wherein any act or transaction constituting the violation occurred."

change on September 15, 1955 constituted a violation within this district, as did his purchase of 100 shares through the Exchange on October 6, 1955. Similarly, Enterprises' purchase of 100 shares on October 16, 1955—ten days after a sale at a higher price per share—constituted a statutory violation within this district.

■ Although defendants have strenuously argued throughout this litigation that the mere occurrence in this district of a few out of a significant number of violations is insufficient to support a finding of proper venue or jurisdiction, I consider myself bound by and indeed concur in the view expressed earlier in this action by Judge Dimock, Blau v. Lamb, 20 F.R.D. 411, at p. 413 (S.D. N.Y.1957), that

" * * * where a plaintiff sues a defendant for the profits upon a short swing transaction some part of which took place within the district, the plaintiff may join claims on similar transactions taking place elsewhere even though plaintiff would not have been otherwise able to get jurisdiction over the defendant as to those claims within the district. Blau v. Mission Corp., 2d Cir., 212 F.2d 77."

See also Falco v. Donner Foundation, Inc., 208 F.2d 600, 40 A.L.R.2d 1340 (2d Cir. 1953); Goldstein v. Groesbeck, 142 F.2d 422, 154 A.L.R. 1285 (2d Cir. 1944) (violation of Public Utility Holding Company Act of 1933 containing similar venue provision); and 2 Loss, Securities Regulation 1045. This view is particularly persuasive in light of the often-stressed remedial purposes of Section 16(b). See, e. g., Smolowe v. Delendo Corp., 136 F.2d 231, 148 A.L.R. 300 (2d Cir. 1943), cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446.

■ Defendants' final argument on venue—that the common stock trading on the Exchange cannot support a finding of venue as to the preferred stock transactions in Ohio—ignores the fact that both types of transactions involved the same defendants, trading in the shares of the same corporation at substantially the same time as part of the same plan to gain control of that corporation.

## IV. PROFITS RECOVERABLE

■ The serious dispute as to the precise amount of profits realized by defendants and recoverable by the corporation centers upon the value, in the spring of 1955, of the Industries common stock surrendered in exchange for Air-Way preferred stock.[10] A determination of this value is crucial to the computation of profits since, under the applicable rules of law, the cost of the stock acquired is based upon the value of the assets delivered in exchange. Stella v. Graham-Paige Motors Corp., 259 F.2d 476 (2d Cir. 1958).

■ Plaintiff maintains that the value of Industries common stock in June, 1955, was no higher than $6 per share. Although it is indeed true that Industries' financial statement for the period ending on June 30, 1955, fixed the book value of the company's stock at $6 per share,[11] the trial testimony of Mr. Edward Lamb, which was not refuted by plaintiff's evidence, and other evidence in the case indicates that in an arms-length transaction between a willing buyer and a willing seller, the value of the stock would have been realistically set at a figure somewhat above "book". What made the exchange particularly attractive from Air-Way's standpoint was the fact that in addition to tangible assets, it was acquiring Industries' recently recruited management team which, so far as could be determined contemporaneously, was largely responsible for a respectable increase in earnings in the last quarter of 1954 and, as well, Industries' promising sales prospects generally

---

10. Market value of the common stock of Air-Way, of course, has presented no major difficulties or disputes in that the common was actively traded during the periods in question.

11. Literally $5.98 according to one financial statement.

in the water heater industry. Industries in the early 1950's had also shown considerable competitive vigor by reason of its acquisitions of other companies and imaginative forays into new product lines. Thus it is that, notwithstanding its comparatively meager cash position in early 1955, I find it unrealistic to accept without qualifications the views of plaintiff's two experts that Industries' stock should be valued at less than $6 per share. On the other side of the coin, I cannot accept Lamb's largely subjective and unsupported evaluation of approximately $15 per share. While it is difficult, of course, to precisely appraise these intangibles ten years in the past, it seems not incompatible with commercial realities a decade ago to add to book value a "premium" of $2.50 in reflection of what Air-Way in reason could. have thought it was achieving in this transaction. The market value of Industries common stock, therefore, is determined as of June, 1955, to be $8.50 per share.

There remain other issues with regard to damages or profits sought to be recovered for the corporation. Plaintiff contends further that the corporation is entitled to recover (1) a 30 cent per share cash dividend on Air-Way common declared on June 30, 1955, and (2) a 100% stock dividend on Air-Way common declared on September 12, 1955.[12]

■ As to the June 30 cash dividend, I regard it as too incidental and not "so inextricably connected" with defendant's purchase-and-sale transactions to be included in the amount recoverable. See Adler v. Klawans, 267 F.2d 840, 849 (2d Cir. 1959). While it may be argued that, because the June 30, 1955, dividend was apparently the highest ever paid by Air-Way, it must have been part and parcel of an overall scheme of short-swing speculation, on balance, I am unpersuaded that such was the case. Air-Way had been paying regular quarterly dividends at least since June, 1954—before that date the record is silent—and declared dividends had fluctuated, a not unusual phenomenon in other companies depending upon usual criteria such as earnings, the state of the industry, management forecasts and the like.

■ The 100% stock dividend is something else again. This should rightfully be recovered by the corporation, largely because the record indicates no precedent, either in the prior or subsequent history of the corporation, for so substantial a dividend. More important, the timing of September 12, 1955 for the declaration and payment of this dividend is suspiciously coincidental with that of the most significant short-swing transactions with which this case is concerned—i. e., one cannot overlook the increased leverage afforded Lamb and his companies by this stock dividend.

■ I also find. that by virtue of Edward Lamb's beneficial ownership of all the stock of Enterprises, and in light of his revelations upon cross-examination and other persuasive evidence as to his control over the directors and their decisions, he must be held jointly and severally liable for the profits realized by Enterprises.

■ Particularly in the light of the history of this protracted litigation, plaintiff's claim for interest on the award to be made in this action would be inequitable and thus, in the court's discretion, is denied. See Blau v. Lehman, 368 U.S. 403, at p. 414, 82 S.Ct. 451, 7 L.Ed. 2d 403 (1962).

An order and judgment in conformity with the foregoing should be settled on notice and without undue delay.

### Supplemental Opinion

This supplement to the opinion of this court in Blau v. Lamb, Civ. 113–395, May 5, 1965, is being filed contemporaneously with the settlement and filing of the judgment for plaintiff in this action.

12. Specifically, plaintiff seeks to recover the cash dividend in connection with the common stock transactions of Lamb and Enterprises, and the stock dividend in connection with the 6,500 shares of common sold by Enterprises on October 13, 1955.

The total amount recoverable jointly and severally from Edward Lamb and Edward Lamb Enterprises, Inc., as a result of short-swing transactions by Enterprises is calculated as follows:

Preferred Stock Transactions

| | | |
|---|---|---|
| 9/13/55 conversion proceeds | $2,406,097.31 | |
| 7/5/55 exchange cost | 1,470,032.50 | |
| Recoverable Profit | | $936,064.81 |

Common Stock Transactions

| | | |
|---|---|---|
| 1955 10/6 sale proceeds (10,500 shares) | $ 199,500.00 | |
| 6/6 purchase cost | 106,911.00 | |
| | $ 92,589.00 | |
| 100% stock dividend on shares sold 10/13 | 60,937.50 | |
| Recoverable Profits | | $153,526.50 |
| 10/6 sale proceeds | $ 1,900.00 | |
| 10/16 purchase on A.S.E. (100 shares) | 1,017.00 | |
| Recoverable Profit | | $ 883.00 |
| 1956 sale proceeds | $ 7,150.00 | |
| purchase cost | 6,561.00 | |
| | | $ 589.00[1] |

Total Profits Recoverable ............................$1,091,063.31

The total amount recoverable from Edward Lamb as a result of his own short-swing transactions is calculated as follows:

Preferred Stock Transactions

| | | |
|---|---|---|
| 1955 9/13, 9/14, 9/15 conversion proceeds | $ 360,517.50 | |
| 7/5, 7/25, 8/13, 9/15 exchange cost | 157,800.00 | |
| Recoverable Profit | | $202,717.50 |

Common Stock Transactions

| | | |
|---|---|---|
| 9/15/55 sale proceeds (A.S.E.) | $ 5,757.12 | |
| 6/6/55 purchase (private transaction) | 3,054.60 | |
| Recoverable Profit | | $ 2,702.52 |
| 9/15/55 sale proceeds (A.S.E.) | $ 1,927.43 | |
| 10/6/55 purchase (A.S.E., 100 shares) | 991.00 | |
| Recoverable Profit | | $ 936.43 |

Total Profits Recoverable ............................$ 206,356.45

1. For purposes of clarification, it should be noted that these 1956 common stock purchases on the American Stock Exchange, referred to on page 159 of the opinion of May 5, 1965, further buttress the finding of proper venue as to Enterprises on pages 159–160 of the opinion.

These total amounts differ from the amounts suggested in both plaintiff's proposed judgment and defendants' counter proposed judgment. Thus, a prime purpose of this supplemental opinion is to explain as succinctly as possible the bases for this court's disagreements with the computations and proposed judgments submitted by plaintiff and defendants.

Both proposed judgments fail to reflect the sale-purchase violations arising from Enterprises' purchase of 100 shares of Air-Way common on the Exchange on October 16, 1955, and Edward Lamb's purchase of 100 shares of common on the Exchange on October 6, 1955. (Page 159 and page 158 of the May 5th opinion, respectively.)

Although plaintiff and defendants each suggest a different method of accounting for the 100% stock dividend received by Enterprises on the 6,500 shares sold ex-dividend on October 13, 1955, the fair and proper way to give effect to this dividend is simply to include in the amount recoverable the value of the 6,500 shares received as a dividend, at the highest market price on the date received. In effect, this means that although no profit was realized on the October 13 sale—since the sales price of $9.25 per share was less than the purchase cost of $10.182 per share on June 6 [2]— plaintiff is nevertheless entitled to recover the actual value of the stock dividend received as a result of this short-swing transaction.

In addition, plaintiff's proposed judgment seeks to recover the sum of $78.60 received by Enterprises as a 5% stock dividend paid on December 18, 1956. I find this dividend to be nonrecoverable under Section 16(b). See the discussion of dividends on page 161 of the May 5th opinion.

Defendants' counter proposed judgment reflects several miscalculations. First, in determining the recoverable profit from the preferred stock transactions of both Enterprises and Lamb, the cost of the preferred stock acquired by exchange must be matched against the highest market price of Air-Way common on the date of disposition by conversion—not against the average price on that date as suggested by defendants. See Marquette Cement Manufacturing Co. v. Andreas, 239 F.Supp. 962, 968 (S.D.N.Y.1965).

Second, with regard to the preferred stock transactions of Edward Lamb, his cost of acquisition of one share of Air-Way preferred was $30—five shares of Industries common, obtained by the exercise of his employee's option to purchase at $6.00 per share.

Finally, in apparent response to the statement on page 158 of the opinion of May 5th that the sale of 300 shares by Lamb through the Exchange on September 15, 1955, constituted a violation when matched with March 18 and 22, 1955 purchases on the Exchange, defendants used the cost of these shares purchased in March as the basis for determining the profit recoverable from the September 15 sale. While it is entirely true that, technically, a violation arose from the incidence of the September 15 sale less than six months after the March purchases, for purposes of computing profits recoverable under Section 16(b), "the highest sale prices are to be matched with the lowest purchase prices within the periods involved" Heli-Coil Corp. v. Webster, 222 F.Supp. 831, 837 (D.C.N.J. 1963). Here, then, plaintiff is correct in matching the 300 shares sold on September 15 with 300 of the 68,100 shares purchased on June 6, 1955 at a lower cost than the shares purchased through the Exchange in March of that year.

---

2. Profits are not to be minimized by setting off losses against them, Gratz v. Claughton, 187 F.2d 46, 51 (2d Cir. 1951).