**HELI–COIL CORPORATION**

v.

**Reginald WEBSTER, Appellant.**

**No. 14809.**

United States Court of Appeals
Third Circuit.

Argued Oct. 20, 1964.

Reargued May 25, 1965.

Decided Oct. 1, 1965.

McLaughlin, Staley, Hastie and Kalodner, Circuit Judges, dissented in part.

Charles Danzig, Riker, Danzig, Scherer & Brown, Newark, N. J., (Cole & Deitz, New York City, of counsel, on the brief), for appellant.

Emory C. Risley, Stryker, Tams & Dill, Newark, N. J., (William T. Sutphin, Newark, N. J., on the brief), for appellee.

Philip A. Loomis, Jr., Gen. Counsel, Washington, D. C. (David Ferber, Sol., Richard M. Phillips, Sp. Counsel, Gus J. Bennett, Atty., S.E.C., Washington, D. C., on the brief), for amicus curiae.

Before BIGGS, Chief Judge, and Mc-LAUGHLIN, KALODNER, STALEY, HASTIE, GANEY, SMITH and FREEDMAN, Circuit Judges.

BIGGS, Chief Judge.

Heli-Coil Corporation brought this suit against one of its directors, Mr. Reginald Webster, to recover alleged short-swing profits under § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78p(b). The pertinent portion of § 16(b) is set out below.[1] All of the events upon which the suit at bar is based took place prior to the effective dates of the Securities Acts Amendments of 1964, Pub.L. No. 467, 88th Cong.2d Sess., Act of August 20, 1964, 78 Stat. 565. We therefore take the statute as it existed prior to the amendments just referred to.

Webster, an industrialist, became a director of Heli-Coil soon after the company was organized on October 16, 1958, at the suggestion of W. C. Langley & Co., (Langley) investment bankers for

1. In pertinent part § 16(b) reads as follows: "For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer * * *."

the company. At the time of his election Webster had been for many years and still is the chairman of the board of Standard-Thompson Corporation, the common stock of which is traded on the American Stock Exchange. On November 20, 1958, Webster purchased at par value plus accrued interest, $60,000 principal amount of Heli-Coil 5% Convertible Debentures due November 1, 1973, and 500 shares of Heli-Coil common stock at $14.50 per share, the par value of the common stock being $1 per share. The debentures were limited to the aggregate principal amount of $1,300,000 and were callable by the company at any time at its election at prices as fixed in the debenture. None were called for redemption. The debentures were to mature in November, 1973. Any debenture holder at his option at any time on or before November 1, 1973, could convert a debenture into common stock of the company "at a conversion price equal to $16⅔ principal amount of Debentures for each share of Common Stock, or at the adjusted conversion price in effect at the date of the conversion determined as provided in said Indenture." It should be noted that the debenture indenture contains typical anti-dilution provisions protecting the conversion rights of the debenture holders.[2]

On December 11, 1958, the shares of Heli-Coil common stock were listed for trading on the American Stock Exchange. The debentures were never registered on any national securities exchange but were traded in the over-the-counter market.

In February, 1959, Langley informed Webster that some of their customers had converted Heli-Coil debentures into the common stock of the company and suggested to Webster that he convert his debentures. The basis of the suggestion for the conversion, according to the uncontradicted testimony of Webster, was that Langley considered Heli-Coil's prospects excellent and that the elimination of indebtedness from the balance sheet of the company would "make a better statement." On March 18, 1959, Webster converted all his debentures into 3600 shares of Heli-Coil common stock, receiving no money upon the conversion. At the time Webster converted his debentures, holders of debentures in principal amount totaling $185,000 had already converted their debentures into common stock, and by April 30, 1959, $283,000 in principal amounts of debentures had been so converted.

On July 16, 1959, approximately eight months after Webster had purchased his debentures, he sold 1000 shares of Heli-Coil common stock for cash in the amount of $69,470.60. Thereafter, on August 26, 1959, Webster sold 200 shares of Heli-Coil common for $14,293.55, and on September 1, 1959, he sold 100 shares of Heli-Coil common for $7,096.86. Prior to the sale of the 1000 shares of Heli-Coil common, Webster consulted with a partner in Langley, Mellor, and with his own accountant, as to whether or not he was "at liberty to sell the stock."

Information respecting Heli-Coil's financial condition was submitted to its board of directors from time to time and it appears that there was nothing in this information to indicate that retention of Heli-Coil common stock was unwise or that any investment in that stock was in jeopardy. Indeed, the company was in good condition and had already declared a dividend. The common stock was rising steadily in value. It is not charged and there is no evidence that at the time Webster sold his stock in the period July-September, 1959, his sales were inspired by any information that was not possessed by or available to any other stockholder, or that Webster acted in other than good faith in selling the stock. Indeed Webster testified that he sold the stock to raise cash to pay some of the expenses incurred in the operation of his racing stable.

The court below filed an opinion, 222 F.Supp. 831, and gave judgment in favor

2. See Exhibit P2, Indenture, Article III, "Conversion of Debentures".

of Heli-Coil in the sum of $116,544.36 without interest.[3] Webster has appealed.

### Contentions of the Parties

Heli-Coil contends (1) that the voluntary conversion by Webster of his debentures into common stock and the subsequent sale of that common stock was a "purchase and sale" within the meaning of the statute; (2) that the voluntary conversion by Webster of the debentures into common stock was a "sale" within the purview of the Act; (3) that the profits resulting from Webster's voluntary acquisition of common stock upon the conversion of the convertible debentures and his subsequent sales of 1300 shares of common stock less than six months after the conversion, were not exempted by § 16(b) as profits on securities acquired "in good faith in connection with a debt previously contracted"; and (4) that the conversion of convertible debentures into common stock is not arbitrage and does not fall within the exemption provision of § 16(d), 15 U.S.C.A. § 78p(d).

Webster in substance endeavours to negate each of these contentions.

Prior to the rehearing *en banc* we requested the Securities and Exchange Commission to file a brief and to give the court the benefit of oral argument as *amicus curiae.* The Commission has done this through its counsel. We conclude that the position taken by the Commission's counsel is correct for the reasons set out hereinafter.

### Statement of Pertinent Statutes and Regulations

The facts are not in dispute. The court below held that the conversion of the debentures into common stock constituted a sale of the debentures and a purchase of the stock within the meaning of §

16(b), and determined further that neither the "securities acquired in good faith in connection with a debt previously contracted" clause, nor the arbitrage exemption of § 16(d) were applicable. The sum of the lower court's holding was that Webster was liable for profits derived by him from the disposition of the debentures upon conversion within six months after his acquisition of them, and from the sale of common stock within six months after the conversion of the debentures into common stock. See note 3 *supra.*

The Commission's counsel take the position that the court below was correct in concluding that Webster's voluntary conversion of debentures into common stock constituted a sale of the debentures and a purchase of the common stock within the purview of § 16(b), and also that the court below was correct in concluding that the marks 16(b) and 16(d) exemptions referred to above were not applicable, but the Commission's counsel concluded that no profit was realized by Webster from the disposition of the debentures upon their conversion, and that accordingly the judgment against him should be reduced to $45,-144.36, the amount of the profit which he realized from the sale of the common stock within six months of the conversion.

The position of the Commission's counsel is, we believe, soundly based on both the language of the statute and its legislative history, as well as on Rule 16d–1, 17 CFR 240.16d–1, promulgated by the Commission pursuant to the authority of the Act. The Securities Exchange Act of 1934 was intended by Congress "to insure the maintenance of fair and honest markets in [securities] * * * transactions." [4] The provisions of § 16(b) were designed to implement this inten-

---

3. The court below gave judgment for Heli-Coil, as we have said in this opinion, in the amount of $116,544.36, without interest. This amount represents the sum of (1) $71,400.00, the difference between the initial purchase price of the debentures and their value on the conversion date, plus (2) $45,144.36, the difference

between the value of the common stock on the conversion date and the price at which the stock was subsequently sold by Webster.

4. See § 2 of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78b.

tion by making it unprofitable for insiders to engage in short-swing speculations. The preamble to § 16(b) expressly states that the section was framed "For the purpose of preventing the unfair use of information which may have been obtained by [a] * * * beneficial owner [to the extent defined by the statute], director, or officer by reason of his relationship to the issuer * * *." The abuses which led to the enactment of § 16(b) were manifold and have been documented so fully in the legislative history of the Act and in the decisions [5] that they need not be enumerated exhaustively or discussed fully here.

Prior to the Securities Acts the difficulty in maintaining a suit by a corporation, or a stockholders' derivative suit, against an officer or director who had profited from inside knowledge of the corporation's business or financial position, was in proving that it was the intent of the officer or director to speculate on the basis of his inside information. Section 16(b) was designed to obliterate this difficulty. Section 16(a), 15 U.S. C.A. § 78p(a), required officers and directors of any corporation the securities of which had been registered pursuant to § 12 of the Act, 15 U.S.C.A. § 78l, as well as beneficial owners of more than 10% of every class of such securities, to file reports of their holdings and transactions in any of the corporation's equity securities.[6] Section 16(b) provides for the recovery by the corporation of any profits realized by an officer or director from "any purchase and sale, or any sale and purchase" of such securities within a six-months' period. Section 3(a) (13), 15 U.S.C.A. 78c(a) (13), defines a "purchase" as including "any contract to buy, purchase, or otherwise acquire," and § 3(a), (14), 15 U.S.C.A. 78c(a) (14), states that a "sale" includes "any contract to sell or otherwise dispose of." The term "profits" is not defined in the Act.

As we have indicated § 16(b) provides that the Commission by rules and regulations may exempt any transactions not comprehended within the purview of the section. Section 16(b) also exempts from the provisions of the section any "security * * * acquired in good faith in connection with a debt previously contracted * * *." Section 16(d) provides that the provisions of § 16 "shall not apply to foreign or domestic arbitrage transactions unless made in contravention of such rules and regulations as the Commission may adopt in order to carry out the purposes of this section." The Commission adopted Rule 16d–1 pursuant to this authority.[7]

---

5. See for example S.Rep.No.1455, 73rd Cong. 2d Sess. 55–68 (1934); S.Rep.No. 792, 73rd Cong. 2d Sess. 7–9 (1934); H.R.Rep.No.1383, 73rd Cong. 2d Sess. 13–14 (1934).

See also the excellent summary of Judge Clark in Smolowe v. Delendo Corporation, 136 F.2d 231, 235, 148 A.L.R. 300 (2 Cir. 1943), cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943).

6. The Securities Acts Amendments of 1964, Pub.L. 467, 88th Cong. 2d Sess., Act of August 20, 1964, 78 Stat. 565, providing for registration under § 12 of the Act of equity securities, extended § 16 to all securities "registered pursuant to section 12."

7. Rule 16d–1 provided: "It shall be unlawful for any director or officer of an issuer of an equity security which is registered on a national securities exchange to effect any foreign or domestic arbitrage transaction in an equity security of such issuer, whether registered or not, unless he shall include such transaction in the statements required by section 16(a) of the act and § 240.16a–1 and shall account to such issuer for the profits arising from such transaction, as provided in section 16(b) of the act. The provisions of section 16(c) of the act shall not apply to such arbitrage transactions. The provisions of § 240.16a–1 and of section 16 of the act shall not apply to any bona fide foreign or domestic arbitrage transaction insofar as it is effected by any person other than such director or officer of the issuer of such security." 17 CFR 240.16d–1 (1948).

### The Law

**A.** *The Conversion of the Debentures Was a Sale of the Debentures and a Purchase of the Common Stock*

Congress defined "purchase" and "sale" in broad terms. Sections 3(a)(13) and 3(a)(14) in our opinion cover not only contracts of purchase and sale but also agreements to "otherwise acquire" or to "otherwise dispose of" securities within the purview of the Act. True, the language of the sections last referred to seems to refer to executory contracts but it must be concluded that these provisions of the Act were intended to apply to executed transactions. If it were otherwise all relief under the Act would have to be by way of injunction or prohibition, surely an impermissible conclusion. The conclusion of the court below that Webster's conversion of his debentures into stock was a sale of the debentures and a purchase of the stock within the definitions of the Act seems to us to be indubitably correct.

There are, insofar as we are aware, but four decided cases which rule directly on the issue of the applicability of § 16(b) to a conversion transaction. The trial court in the case at bar based its ruling largely on Park & Tilford v. Schulte, 160 F.2d 984 (2 Cir. 1947), cert. denied, 332 U.S. 761, 68 S.Ct. 64, 92 L.Ed. 347 (1947). We shall discuss this case first.

In Park & Tilford, some, but by no means all, of the facts involved in the instant case were present. In that case three Schulte brothers, one of whom was a director of the plaintiff corporation, as trustees of a trust created by their father, were the owners of a majority of the common stock of the plaintiff and substantial owners of its preferred stock with a conversion privilege. The common stock was enjoying a substantial rise in market value. While this increase in market value was in progress, the company, which was subject to the control of the Schultes, served a 90-day notice of the redemption of the preferred. In about a month the Schultes exercised the conversion privilege, contending that they were forced to convert because the redemption price was less than the market value of the common. The Schultes then sold their common stock within six months of their conversion at a large profit. It seems apparent from reading the opinion of the court that the Schultes' profit was gained by the exercise of knowledge gleaned from their "insiders'" position, an operative fact not present in the case at bar. The circumstance that "inside knowledge" was obviously made use of in the Park & Tilford case was not, however, the basis of the decision of the Court of Appeals of the Second Circuit. We point out parenthetically that the Schultes' transactions that the court was dealing with were executed rather than executory.

On the issue of the character of the transaction, Judge Clark, speaking for the court, stated, 160 F.2d at 987: "We think a conversion of preferred into common stock followed by a sale within six months is a 'purchase and sale' within the statutory language of § 16(b). Whatever doubt might otherwise exist as to whether a conversion is a 'purchase' is dispelled by definition of 'purchase' to include 'any contract to buy, purchase, or otherwise acquire.' § 3(a)(13). Defendants did not own the common stock in question before they exercised their option to convert; they did afterward. Therefore they acquired the stock, within the meaning of the Act. The Act certainly applies as well to executed acquisitions as to executory contracts to acquire. Not otherwise could the Act accomplish the Congressional purpose to protect the outside stockholders against at least short-swing speculation by insiders with advance information."

The plaintiff-appellant in the case at bar, Webster, points out that in Park & Tilford the defendant Schulte brothers were in control of the issuer; that they owned almost all of its outstanding preferred stock; that the preferred stock was not readily marketable "and since the conversion privilege was not protected against dilution, the preferred stock was

not the 'economic equivalent' of the common."[8] Webster further points out that the Schultes converted their preferred stock into common stock of much greater value and then sold all of the common stock obtained by the conversion within six months of the conversion. In the case at bar it is to be noted that Webster sold only 1300 out of the total of 3600 shares of common stock which he obtained by the conversion and that it is undenied that he made the sales of common stock to meet liabilities incurred by him in connection with his racing stable. In Roberts v. Eaton, 212 F.2d 82, 85 (2 Cir. 1954), cert. denied 348 U.S. 827, 75 S.Ct. 44, 99 L.Ed. 652, the court pointed out that the Schultes were able to work their will on the corporation through the board of directors and that such control is absent from the case at bar. This has been considered to be a critical factor. See 2 Loss, Securities Regulation 1069–70 (2d ed. 1961).

The second case is Ferraiolo v. Newman, 259 F.2d 342 (6 Cir. 1958), cert. denied 359 U.S. 927, 79 S.Ct. 606, 3 L.Ed. 2d 629 (1959). In 1948 Newman acquired 43,720 shares of the convertible preferred stock of Ashland Oil & Refining Company as the result of a merger and at that time became a director of Ashland. More than three years later, on November 23, 1951, he exercised the right to convert these shares into 48,092 shares of Ashland common stock. Within six months after the conversion, he sold 20,000 shares of Ashland common stock at prices in excess of the November 23, 1951 prices. Ferraiolo, a stockholder of Ashland, demanded that Ashland sue Newman to recover Newman's profits resulting from the transaction which we have described. The trial court gave summary judgment in favor of Newman, ruling that the transaction was not covered by § 16(b). Ferraiolo had been permitted to intervene in the action, and he appealed.

The Court of Appeals for the Sixth Circuit, speaking by Judge, now Mr. Justice, Potter Stewart, stated that it could be gathered from the "abbreviated" record that Newman was a very inactive director of Ashland and that he was not in fact privy to any inside information concerning the company, albeit such considerations were irrelevant to the applicability of § 16(b). Judge Stewart went on to say that the narrow question presented was whether Newman's acquisition of his common stock by the conversion was a "purchase" within the meaning of § 16(b). He pointed out that the statute itself furnished no definition that would supply "an easy answer to the question." He noted that in his view that while the term "purchase" includes, as recited in the Act, "any contract to buy, purchase, or otherwise acquire," 15 U.S.C.A. § 78c (a) (13), indicating that the transaction was not one falling within the ordinary concept of a "purchase," [9] nonetheless the statutory definition did not necessarily exclude Newman's transactions. Citing decisions of the Court of Appeals for the Second Circuit, Judge Stewart took the position that each case had been decided on its own facts and a "black letter rubric" was to be avoided.

Judge Stewart concluded that the standard to be applied, simply stated, was that every transaction which can reasonably be defined as a "purchase" should be so defined "if the transaction is of a kind which can possibly lend itself to the speculation encompassed by Section 16 (b)."[10] Pointing out that Newman's preferred shares, acquired by him in 1948, were subject at any future time to call for redemption by Ashland, that the conversion privilege was undilutable, and that the preferred stock in the "objective judgment of the market place" was the

8. See appellant Webster's brief at 15.

9. Citing the definition from Shaw v. Dreyfus, 172 F.2d 140, 142 (2 Cir. 1949), cert. denied 337 U.S. 907, 69 S.Ct. 1048, 93 L.Ed. 1719 (1949): "The generally understood meaning of 'purchase' is to acquire something by one's own act or agreement for a price."

10. Citing "The Scope of 'Purchase and Sale' Under Section 16(b) of the Exchange Act," 59 Yale L.J. 510, 513 (1950).

"economic equivalent" of the common stock, the real effect of Ashland's subsequent call of the preferred "was simply to force the surrender of the preference features of the preferred." Judge Stewart laid emphasis on the fact that in Park & Tilford, Inc. v. Schulte, the conversion was wholly voluntary in that the insiders, the Schultes, had complete control of the corporation and could determine therefore whether the preferred would or would not be called for redemption. By way of contrast, Judge Stewart concluded that Newman's conversion was "in a very real sense involuntary" because he would have lost approximately $9 a share if he had allowed his preferred stock to be redeemed.

The sum of the decision in Newman, as we read it, is that there is no "sale" within the meaning of § 16(b) when one type of equity security is converted into another if the securities are substantial economic equivalents and the conversion is "involuntary" in the sense that if there is no conversion the owner will suffer substantial economic loss. Obviously the rule of Ferraiolo v. Newman would be equally applicable to a situation in which debentures convertible into common stock were in fact so converted.

The third decision is Blau v. Max Factor & Company, 342 F.2d 304 (9 Cir. 1965). In this case the corporation prior to 1947 had been a family company. In 1947 Max Factor common stock was offered to the public and class A stock was issued the following year as a part of a plan to permit the company to pay maximum dividends to nonfamily stockholders, while retaining earnings otherwise payable to the family stockholders, the defendants appellees, for the purpose of avoiding taxes. The class A stockholders had equal voting rights with the common; neither class of stock was subject to redemption, and both classes were fully transferable. The board of directors, however, had the power to declare smaller dividends on the common than on the class A stock. The common was made exchangeable for class A at any time and, in accordance with the plan, substantially all of the public stockholders almost immediately exchanged their common stock for class A, the individual appellees, however, retaining their common. It appeared that at all relevant times the individual appellees owned more than 75% of the voting stock and constituted more than a majority of the board of directors, and were able, therefore, to determine whether and to what extent the power to declare lesser dividends on the common stock would be exercised. It appeared also that the dividends declared on the common stock were in fact materially less than those paid on the class A stock. The individual appellees were indeed "insiders" and in charge of the company.

In 1960, the individual appellees decided to offer a portion of their stock interest to the public, and on March 14, 1961, in contemplation of this public sale and in the exercise of the right conferred by the company's certificate of incorporation, they exchanged 200,000 shares of their common stock for 200,000 shares of class A stock and sold the latter to the public on April 18, 1961.

The Court of Appeals of the Ninth Circuit, by Judge Browning, pointed out that the common stock involved in the exchange had been acquired by the individual appellees from 5 to 32 years earlier, and that not one of them had acquired class A stock within six months of the sale except by the exchange. It was conceded that the appellees made a "sale" of their class A stock less than six months after the exchange of their common stock for the class A stock but the trial court concluded that the exchange of the class A was not a "purchase" of class A within the meaning of § 16(b).[11] The Court of

---

11. The trial court held also that the transaction was excluded from the purview of § 16(b) by Rule 16b–9 of the Securities and Exchange Commission promulgated four months after the filing of the suit in the court below. Rule 16b–9 exempts from the operation of § 16(b) the exchange of shares of one class of stock for shares of another class in the same corporation pursuant to a conversion right in

appeals adopted what was in substance the reasoning of the trial court and reached the same result. The Court of Appeals held that the exchange of class A stock for common did not interrupt the "continuity of the appellees' investment" and that the exchange did not increase or decrease the amount invested or alter in any way the risk assumed by the appellees "long years before." The court concluded that the conversion and its timing must be deemed to be "irrelevant to the use of insider information in short-term speculation—the problem with which section 16(b) is concerned", and that no liability should be imposed on the individual appellees.

The fourth case which involved a conversion is B. T. Babbitt, Inc. v. Lachner, 332 F.2d 255 (2 Cir. 1964). The court held that § 16(b) applied to the conversion of preferred stock into common by an insider, citing Smolowe v. Delendo Corp., 136 F.2d 231, 148 A.L.R. 300 (2 Cir. 1943), cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943). But the court was focusing its attention on the nature and effect of parallel transactions and Judge Kaufman's opinion was not intended to and does not place in focus the issue of what constitutes a sale within the purview of the statute.

What conclusions are to be drawn from the foregoing? We have reduced the citation of authorities in this opinion to a minimum for the views and rulings of numerous courts on the application of § 16(b) to various diverse transactions on the part of "insiders" are contained in the cases set out in the copious footnotes to the opinions which we have just cited and discussed. It would, we believe, serve no useful purpose to discuss here these very numerous authorities. We think the decision in this case must turn on the basic purpose of the statute.

What is that purpose? Obviously, as already stated, it was to prevent those abuses which existed prior to the passage of the Securities Exchange Act of 1934, one of the greatest of which was the acquisition of profits by short-swing speculations by insiders. The Act renders such speculations unprofitable. But the trial courts and the courts of appeals have taken two divergent roads to what they deem to be the same end. One road leads out of Park & Tilford; the other from Ferraiolo v. Newman. The test of the first is very largely objective; the second, in part, at least, seems subjective. Ferraiolo rests on the following standard, 259 F.2d at 345: "Every transaction which can reasonably be defined as a purchase will be so defined, if the transaction is of a kind which can possibly lend itself to the speculation encompassed by Section 16(b).", citing "The Scope of 'Purchase and Sale' Under Section 16(b) of the Exchange Act", 59 Yale L.J. 510, 513 (1950). Whether or not a transaction "can possibly lend itself to the speculation encompassed by Section 16(b)" must be determined to some degree at least by the minds of the finders of fact. To that extent the test or standard of Ferraiolo must be deemed to be a subjective rather than an objective one. On the other hand the test employed in Park & Tilford employs the language of §§ 3(a) (13) and 3(a) (14) in the manner in which we think Congress intended it to be used and that is in no sense a subjective one.

It is true that the common stock acquired by Webster was the economic equivalent of his debentures prior to the conversion and it is difficult to perceive how an economic advantage could be de-

the company's charter if the classes of shares exchanged possess substantially the same rights and privileges except that the board of directors may declare a lesser dividend on the class surrendered than on the class acquired, and if the exchange was effected in contemplation of a public sale of the shares acquired. The rule was expressly made retroactive. 17 CFR § 240.16b-9 (1963).

The Court of Appeals of the Ninth Circuit did not decide any issue presented by this facet of the decision of the trial court, for, as it points out, it did not have to do so in the light of its decision. See n. 3, Blau v. Max Factor & Company, cited to the text, 342 F.2d at 306.

rived by Webster from the conversion, but there is one situation which, we think, suggests clearly a possible trading advantage in holding common stock rather than debentures. If, as an insider, an individual has prior knowledge of the date on which the debentures will be called by the corporation, there can be an advantage, and this can be true, we believe, even if the debenture indenture contains anti-dilution provisions as in the case at bar, for when the debentures are called they are no longer tied to the price of the stock. In advance of the information respecting the call being made public, if the insider has any knowledge that will affect the future price of the common stock, such as an increased dividend to be paid after the senior security has been retired, he would be in a position to profit by his conversion. This seems to be an instance when a decision to convert could involve speculative or subjective judgment as to trading advantages to be anticipated in holding stock rather than convertible debentures.

We do not state or mean to imply that Webster was actuated by such a motive as we have suggested could animate an insider to speculate under the circumstances outlined in the preceding paragraph. But we are of the opinion nonetheless that it was the intention of Congress in enacting § 16(b) to obviate any necessity for a search of motives of the insider or require an investigation of whether or not his actions were animated by inside information to gain a speculative profit. It may be argued that to bring the sanction of § 16(b) into operation the words of § 16(b), "For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer," require proof that the information obtained by the insider was used unfairly by him to obtain a profit and that if the insider did not so employ the information Congress did not intend to render him liable to the corporation for his profits. In short, it may be contended that the phrases last quoted are an opera-

tive portion of the statute rather than a descriptive part thereof. We cannot accept such an argument for to do so would again put a suing corporation in the difficult position, in which it would have been prior to the passage of the Act, of having to prove the "unfair use" of corporate information by the insider; in effect, would require the corporation to prove the intent of the insider, and therefore, to a degree at least, what was in his mind. To require such proof would vitiate § 16(b). We conclude that Congress in using the phrases last quoted was making a declaration as to the premise on which it was proceeding, saying in substance that to prevent the unfair practices of insiders, it was deemed necessary to lay down a hard and fast rule that any insider who obtained profits within the statutory period, for example, from a "purchase and sale" of securities, should be liable to the issuer for his profits whether he did or did not make use of inside knowledge. Congress, in our opinion, was expressing the broad premise that only in this way could short-swing speculations by insiders be rendered unprofitable and hence curbed, and was stating that this should be the law.

In short, Congress intended the test to be an entirely objective one. We repeat, perhaps needlessly, that it is our view that if an individual realizes any profit from the purchase or sale, or the sale or purchase of any equity security of any issuer in relation to which he possesses the status prescribed by the Act, within the period of time provided by § 16(b), he is liable to the extent of his profit unless the transaction falls within one of the exemptions provided by § 16. In this connection we point out that the Commission is authorized by § 16(b) to exempt by rules any transactions deemed "not comprehended within the purpose of this subsection." It would seem, therefore, that Congress had confided to the Commission rather than to the courts the difficult task of determining those particular circumstances which would justify the exemption of certain transactions

from the purview of the statute.[12] We conclude that § 16(b) does set up a "rule of thumb" and was intended by Congress to do precisely that.[13]

12. It is noted that § 240.16b–5 of the Rules of the Securities and Exchange Commission relating to "Commodity and Securities Exchanges," 17 CFR page 331, October 4, 1952, provides exemption from the operations of § 16(b) of certain transactions in which securities are received by redeeming other securities. Excluded from the exemption are equities securities "other than a convertible security or a right to purchase such a security" by a director or officer of the issuer. It would appear, therefore, that the Commission has ruled upon such a transaction as that at bar and has decided that it should not be exempted from the purview of § 16(b). Cf. Note 5 cited to the text in Blau v. Max Factor & Company, 342 F.2d 304, 307 (9 Cir. 1965).

13. The following is a brief legislative history of the National Securities Exchange Act of 1934: According to the Congressional Record, S. 2693 was introduced by Senator Fletcher of Florida in the 2nd Session of the 73rd Congress on February 9, 1934 and was referred to the Senate Committee on Banking and Currency. 78 Cong.Rec. 2264 (1934). Extensive hearings were held on the bill, and Thomas G. Corcoran, Esq., testified before the Committee on February 27, 1934. Mr. Corcoran had been instrumental in drafting S. 2693, and his testimony was for the purpose of explanation and clarification. See hearings, entitled "Stock Exchange Practices", before the Committee on Banking and Currency, United States Senate, 73rd Cong., Part 15, National Securities Exchange Act of 1934, February 26 to March 16, 1934, pp. 6463–6581. The testimony concerning § 16(b) of what became the final Act, § 15(b) of the bill then under discussion before the Senate Committee, S. 2693, is found on pages 6556–6561. Following the hearings, on April 20, 1934, Senator Fletcher introduced S. 3420 as a substitute for S. 2693. 78 Cong.Rec. 6980 (1934).

The House bill, H.R. 9323, was introduced by Representative Rayburn on April 25, 1934, and was referred to the Committee on Interstate and Foreign Commerce. 78 Cong.Rec. 7376 (1934). H.R. 9323 as amended was passed by the House on May 4, 1934. 78 Cong.Rec. 8116 (1934).

On May 12, 1934, the Senate took up consideration of the House bill, and H.R. 9323 was substituted by S. 3420 as amended in the Senate. 78 Cong.Rec. 8714 (1934). The House and Senate versions of the bill went to the Conference Committee on May 14, 1934. 78 Cong.Rec. 8766, 8788 (1934). The Conference Report on the bill was passed by both the Senate and the House, and the National Securities Exchange Act of 1934 became law on June 6, 1934. 78 Cong.Rec. 10185, 10269, 10847 (1934).

Section 16(b) of the Securities Exchange Act of 1934, ch. 404, § 16(b), 48 Stat. 896, appears to resemble in pertinent part § 15(b) of S. 2693. Mr. Corcoran read § 15(b) of S. 2693, which provided: "It shall be unlawful for any director, officer, or owner of securities, owning as of record and/or beneficially more than five per centum of any class of stock of any issuer, any security of which is registered on a national securities exchange—(1) To purchase any such registered security with the intention or expectation of selling the same security within 6 months; and any profit made by such person on any transaction in such a registered security extending over a period of less than 6 months shall inure to and be recoverable by the issuer, irrespective of any intention or expectation on his part in entering into such transaction of holding the security purchased for a period exceeding 6 months."

Mr. Corcoran then stated: "That is to prevent directors receiving the benefits of short-term speculative swings on the securities of their own companies, because of inside information. The profit on such transaction under the bill would go to the corporation. You hold the director, irrespective of any intention or expectation to sell the security within 6 months after, because it will be absolutely impossible to prove the existence of such intention or expectation, and you have to have this crude rule of thumb, because you cannot undertake the burden of having to prove that the director intended, at the time he bought, to get out on a short swing."

See hearings on "Stock Exchange Practices", supra, at 6556–57.

At the same hearings Senator Bulkley, Senator Carey and Mr. Corcoran discussed several kinds of transactions, such as sales against the box by an insider with knowledge that his company was going to pass a dividend, with the intention of "purchasing" the stock after news of the dividend was public. Senator Carey then said: "If something happened so that he [the insider] had to raise some money, he would be penalized by the difference between his high and his low price." Mr. Corcoran replied: "Yes.

We have noted that the conversion in Ferraiolo was in effect a compulsory one while that in Park & Tilford in substance was not, and though we think this may be a distinction of some importance, compulsion or lack of it is not a factor in the case at bar. We therefore base our conclusion on the "rule of thumb" as stated. We hold in the case at bar that the conversion of the debentures by Webster was a sale of the debentures and a purchase of the common stock.

### B. The Appellant Did Not Realize Profits at the Time of the Conversion of the Debentures

The issue of whether the appellant "realized" any profit by the conversion of the debentures is a novel one. The Act provides no definition of the term "profit" or of the term "realize", and we can find no decision and none has been cited to us which seems to be directly in point. The facts are plain, however. When Webster converted his debentures on March 18, 1959, they were selling at approximately $2100 for each $1000 of face value, clearly reflecting the fact that the common stock was selling at approximately $36 as compared with the conversion price of $16⅔. For market or speculative purposes, therefore, each debenture was at that time the substantial economic equivalent of the common stock into which it was convertible and into which the appellant converted it. After the conversion Webster retained his investment position in the securities of the issuer, Heli-Coil, and what profits had accrued to him were "paper" profits held by him at the risk of the market and which could disappear if the market declined to a sufficient extent.

Since Congress did not define the term "realize" we may assume that it intended the word to have its ordinary meaning and that it was not employed as a term of art. "[R]ealization" means "to realize", says Webster's International Dictionary (2d ed. 1948), giving as the term's first meaning: "To convert an intangible right or property into real (tangible) property; hence, to convert any kind of property into money."[14]

The term "profit", being undefined by the Act, must also be assumed to have its ordinary or usual meaning. The word "profit" is defined by the same authority as meaning "gain" as well as "the excess of the price received over the price paid for goods sold." Bouvier's Law Dictionary (Rawle's Third Revision 1914), describes "profit" as "the advance in the price of goods sold beyond the cost of purchase."[15] Measuring the terms "profit" and "realize" in conjunction, we think it is clear that Congress intended that ordinarily no gain in the value of securities should be deemed to be realized

You have to have a general rule. In particular transactions it might work a hardship, but these transactions that are a hardship represent the sacrifice to the necessity of having a general rule." Hearings "On Stock Exchange Practices," supra, at 6558.

See also, Meeker and Cooney, "Insiders" under 16(b), 45 Va.L.Rev. 949, 951–52 (1959).

14. Words and Phrases (1962), citing McAvoy v. Schramme, 264 N.Y.S. 181, 238 App.Div. 225 (1933), states that "'[R]ealize' ordinarily means receipt of cash in hand", but points out that the word was not used in such a sense in the attorney's retainer contract under consideration in that case.

Another definition given by Words and Phrases, citing U.S. Smelting, Refining & Min. Co. v. Haynes, 111 Utah 172, 176 P.2d 622, 623 (1947), states that "Money, property, or profits 'realized' usually means brought into possession, and the word does not include paper profits or estimated profits, but is usually used in contrast to hope or anticipation but it need not be cash in hand to be realized gain or income." The decision cited is in a tax case but the definition seems apposite here.

15. Words and Phrases states that "Profit means pecuniary gain," citing Feine v. McGowan, 188 F.2d 738, 740 (2 Cir. 1951). Words and Phrases defines "profit" as meaning "the excess of the price received over the cost of purchasing and handling the goods", citing Stratton v. Cartmell, 114 Vt. 191, 42 A.2d 419, 422 (1945). The cases cited are tax cases but their definitions seem helpful here.

as a profit under the Act until there had been a definitive act by the owner of the securities whereby the paper value of the securities has become a real and an includible one—in the case at bar, by a sale of the common stock by Webster for cash.

One cannot doubt, and we do not believe that it can be contended successfully to the contrary, that the sale of the common stock by Webster was indeed a sale, no matter how the term "sale" be defined. But another problem is presented, and this requires further discussion of Blau v. Max Factor & Company, supra. In this connection we point out again the time-table of events relating to the securities held by Webster. The debentures were purchased on November 20, 1958, and were converted by him on March 18, 1959. The conversion, therefore, took place 3 months and 26 days after the purchase of the debentures. The first sale by Webster of common stock took place on July 16, 1959, and the last sale occurred on September 1, 1959, Webster selling, as has been said, 1300 shares. The period between the date of the conversion, March 18, 1959, and the date of the first sale, July 16, 1959, was 3 months and 28 days, and the period between the conversion and the last sale of stock was 5 months and 14 days. The period between the purchase of the debentures and the time of the first sale of the stock, of course, exceeded 6 months. But the Court of Appeals for the Ninth Circuit in Max Factor treated the exchange of Class A stock for common stock in that case as not interrupting "the continuity of appellees' investment," and the exchange was deemed "in reality [to be] only a step in the process of sale—and an unnecessary one at that * * *." Blau v. Max Factor & Company, supra, 342 F. 2d at 308. The transactions in that case were held to be without the six-months' period prescribed by the statute.

■ We have difficulty in distinguishing the circumstances of the Max Factor case from those of the case at bar, albeit as Judge Browning points out referring to Park & Tilford, the conversion in that case "required an investment deci-sion within the six months' period distinct from the decision to sell the converted security"; in other words in Park and Tilford "a new investment risk was undertaken, and a new, if limited, opportunity was presented to realize profit, or avoid loss, through the use of insider information." 342 F.2d at 309. We cannot, with all deference, agree with the reasoning of the Court of Appeals for the Ninth Circuit in the Max Factor case, for we are of the opinion that since Webster did make an investment decision executing it and acquiring a new security when he converted the debentures into common stock, it follows as a necessary legal conclusion that the short-term profit realized by him during the six months after March 18, 1959, is recoverable from him unless his transactions fall within one of the statutory exemptions. The making of the investment decision and its execution are the incidents which actuate the application of § 16(b) to Webster's profits gained by him from the sale of the common stock.

### C. The Common Stock Was Not Exempt Under the Provisions of the Act

■ The appellant's first contention is that the common stock acquired by him was exempt "as a security acquired in good faith in connection with a debt previously contracted." We conclude that the district court correctly decided this issue and that it is unnecessary to discuss it at length here. The cases relied on by the appellant, Smolowe v. Delendo Corp., supra, and Rheem Manufacturing Co. v. Rheem, 295 F.2d 473 (9 Cir. 1961), were decisions in which the exemption was deemed applicable because the securities were received in settlement of matured debts which existed apart from any existing obligation to transfer the securities. See Booth v. Varian Associates, 334 F.2d 1, 5 (1 Cir. 1964). In Varian Associates the Court of Appeals quoted with approval from the opinion of the lower court, 224 F.Supp. 225, at 227, stating that to accept the argument urged by the defendants there, and by the appellants

in the case at bar, would "open the door to widespread evasion of the act, since any acquisition of stock could take the form of a contract in which the seller would owe a debt, that is would have a firm obligation to deliver the stock at some future date, and the buyer would * * * have a correponding obligation to pay for the stock at a future date in money or other property." The statement of the trial court in Varian Associates, supra, as it continues at 227 is most apposite: "Clearly [to fall within the exemption] the debt referred to in § 16(b) must be an obligation independent of the obligation to deliver the very stock involved in the purchase." We conclude that the appellant's position upon this issue is without merit.

■ The appellant also claims that the conversion of debentures into common stock was exempt as an arbitrage transaction under § 16(d). We cannot agree for the reasons stated by the court below, 222 F.Supp. at 836–837. In addition we state that Webster seems to concede that the conversion of the debentures does not fall within any of the common examples of arbitrage and this is a necessary concession. Arbitrage is defined as a "simultaneous purchase and sale of the same or equivalent security, commodity, contract, insurance, or foreign exchange on the same or different markets in order to profit from price discrepancies." [16] The practice is described in Falco v. Donner Foundation, Inc., 208 F.2d 600, 603, 40 A.L.R.2d 1340 (2 Cir. 1953) where it is stated: "Arbitrage is nowhere defined in the statute. In ordinary usage it refers to a specialized form of trading which is said to be based upon disparity in quoted prices of the same or equivalent commodities, securities, or bills of exchange. In its most common form it involves purchase of a commodity against a present sale of the identical commodity for future delivery—time arbitrage; or a purchase in one market, say New York, against a sale in another, such as London—space arbi-

trage. There is also a third, somewhat less common, form—kind arbitrage. This consists of a purchase of a security which is, without restriction other than the payment of money, exchangeable or convertible within a reasonable time into a second security, together with a simultaneous offsetting sale of the second security. [Citation of authorities.] Thus an arbitrager may buy warrants or rights to buy stock, simultaneously selling short the stock itself, and subsequently covering the short sale by exercising his right or warrant."

In the instant case the very essence of arbitrage is lacking for there was an interval of nearly four months between the time of the purchase of the debentures and their conversion, and an interval of several months between the acquisition of the common stock and its sale.

Other points raised by the parties do not require discussion.

■ For the reasons stated the judgment of the court below will be modified to provide for the recovery of $45,144.36 only by Heli-Coil Corporation from Reginald Webster, the profits realized by him from the sale of the common stock and, as modified, the judgment will be affirmed.

McLAUGHLIN, Circuit Judge (concurring and dissenting).

The transaction before us is the exact sort of scheme to obtain insider profits by short term dealings in convertible debentures and common stock that Section 16(b) of the Securities Exchange Act of 1934 (15 U.S.C.A. § 78p(b)) prohibits. The Securities & Exchange Commission, which at our invitation filed a brief in this appeal, fully agrees with that conclusion as does the court opinion, The plain rightness of the conclusion is convincingly set out in the latter and needs no further discussion.

The Commission, however, went on in its brief to argue that appellant in this instance should not be assessed his gains in the conversion operation because, according to the Commission, he did not

---

16. Webster's International Dictionary (3d ed. 1961).

make a recognizable profit under 16(b). In attempting to arrive at what might be described as a golden mean, the Commission's reasoning, followed in the court opinion, is at odds with the conceded purpose of the statute, utterly unrealistic and, in ascribing lack of realized profit to appellant on his debenture maneuver, is impossible to follow.

Some effort has been made to explain away the accurate calculation by the district judge of appellant's profit on his debenture sequence but the fact has never been disproven.

Admittedly appellant's conversion of the debentures was voluntary. The guide line decision in the situation before us is Park & Tilford v. Schulte, 160 F.2d 984, 987 (2 Cir. 1947), cert. den. 332 U.S. 761, 68 S.Ct. 64, 92 L.Ed. 347 (1947). There a similar voluntary conversion of preferred stock into common followed by a sale within six months was held to be "a 'purchase and sale' within the statutory language of § 16(b)." As to this the court said: "Whatever doubt might otherwise exist as to whether a conversion is a 'purchase' is dispelled by definition of 'purchase' to include 'any contract to buy, purchase, or otherwise acquire.' § 3(a) (13). Defendants did not own the common stock in question before they exercised their option to convert; they did afterward. Therefore they acquired the stock, within the meaning of the Act. The Act certainly applies as well to executed acquisitions as to executory contracts to acquire. Not otherwise could the Act accomplish the Congressional purpose to protect the outside stockholders against at least short-swing speculation by insiders with advance information." From that time down to and including the present the Park & Tilford holding that the conversion of a senior security into a junior security is the purchase of the latter within the meaning of Section 16(b) has been accepted as the general rule. Blau v. Lehman, 286 F.2d 786 (2 Cir. 1960), affirming 173 F.Supp. 590 (D.C.S.D.N.Y.1959), affirmed 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403

(1962); B. T. Babbitt, Inc. v. Lachner, 332 F.2d 255 (2 Cir. 1964).

In affirming another like exchange as a purchase and sale, the Second Circuit Court of Appeals said, "There is only one way to prevent stock manipulation by insiders to whom confidential information is available, and that is to squeeze every possible penny of profit out of such transactions." Blau v. Lehman, supra, 286 F.2d p. 791. Though the use or knowledge of inside information is not a necessary prerequisite for the application of Section 16(b), Ferraiolo v. Newman, 259 F.2d 342, 346 (6 Cir. 1958), cert. den. 359 U.S. 927, 79 S.Ct. 606, 3 L.Ed.2d 629 (1957); Smolowe v. Delendo Corporation, 136 F.2d 231, 148 A.L.R. 300 (2 Cir. 1943), cert. den. 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943). Rheem Mfg. Co. v. Rheem, 295 F.2d 473 (9 Cir. 1961), the unmistakable fact that this defendant had such inside information is a matter of record in this case.

The majority substantially repeats the defense argument that Webster had " * * * no opportunity either to realize a trading gain on speculative judgment exercised when the debentures were purchased or to exercise speculative judgment anew on the basis of inside information possessed at the time of conversion." What happened here was that appellant, instead of holding the debentures or selling them converted them into common stock and thus, as the district court correctly ruled, "engaged in a transaction which could have resulted in the short term speculation which section 16(b) is designed to prevent." By converting his debentures, appellant took the money which in effect he received for them, bought common stock with it and then sold 1300 shares of that stock within six months thereafter. In so doing he completed the cycle of purchase and sale of his debentures and common stock contrary to Section 16(b).

If appellant's tactic could possibly have been used for short term speculation it is prohibited by the statute. Ferraiolo v. Newman, supra, 259 F.2d p. 346. In the light of this, appellant simply proclaims

that the district court's above noted clear factual resolvement of his financial ploy does not find that it could possibly have been used for short term speculation and so come under the ban of the statute. Appellant quotes and relies on an anonymous (student comment) piece in 59 Yale L.J. 510, 524 (1950) titled "The Scope of 'Purchase and Sale' under 16(b) of the Exchange Act" as his authority for concluding that "No profit, either in the normally accepted sense or within the meaning of § 16(b) was realized by Webster as a result of his conversion of the debenture into common stock." The court opinion embraces that proposition completely. In sharp contra distinction to this combined view is the objective, basic computation by the district court which reveals that on May 18, 1959, the Webster debentures were to be reasonably valued at $131,400, representing the value of the 3600 shares of common stock at 36½ received for them. The original cost of those debentures had been $60,-000. That gave Webster a statutory "profit realized" for $71,400 from this branch of his venture. It was for this amount that judgment was entered on the conversion phase against Webster in the district court. There is no authentic challenge of those figures nor of their rightful assessment against appellant because of his illegal manipulation of appellee's debentures and common stock.

I would therefore affirm the judgment of the district court, i. e. for the $71,400 profit realized on the conversion of the debentures plus the $45,144.36 profit realized on the sale of the stock, making a total of $116,544.36.

Judge STALEY joins in this concurrence and dissent.

HASTIE, Circuit Judge, with whom KALODNER, Circuit Judge, joins (dissenting in part and concurring in part).

Judge KALODNER and I join in the holding that no violation of section 16(b) occurred when the appellant surrendered his convertible debentures and received their equivalent in common stock less than six months after he had purchased the convertible debentures. We dissent from the holding that the appellant's sale of that common stock less than 6 months after the conversion violated section 16 (b). Accordingly, we join in setting aside part of the money judgment that was recovered below but dissent from the affirmance of the remainder of that award.

Our position is that the conversion on March 18, 1959 was neither a "sale" nor a "purchase" of securities within the meaning and proscription of section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b). And since more than six months elapsed between the purchase of the convertible security and the sale of the equivalent conversion security for which it had been exchanged, the appellant engaged in no such in and out trading within a six month period as the statute seeks to prevent.

The district court and a majority of this court view the March 18 conversion as both a sale of debentures, which had been purchased less than six months earlier, and a purchase of common stock, which was sold less than six months later. They reason that a convertible debenture is a form of property distinct from the common stock of the same corporation for which, by its terms, it can be exchanged. And each is an "equity security" under section 3(a) (11) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a) (11). Therefore, employing the normal meaning of words in the law of sales, one can describe the exchange of such a debenture for common stock as a "sale" of one equity security and a "purchase" of another. In this view, the "sale" of the debentures occurred less than six months after Webster had bought them, the simultaneous "purchase" of common stock occurred less than six months before Webster sold it, and each set of paired transactions violated the statute. Moreover, support for this analysis appears in a considered decision of the Court of Appeals for the Second Circuit. Park & Tilford, Inc. v. Schulte, 1947, 160 F.2d 984, cert. denied

332 U.S. 761, 68 S.Ct. 64, 92 L.Ed. 347. But cf. Blau v. Lehman, 2d Cir. 1960, 286 F.2d 786, aff'd, 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403; Roberts v. Eaton, 2d Cir. 1954, 212 F.2d 82, cert. denied, 348 U.S. 827, 75 S.Ct. 44, 99 L.Ed. 652.

Judge KALODNER and I think that, in the context of the present case, this rationalization of the majority is an oversimplication of the problem which leads to an unjust and unwarranted result. This is a situation where a director bought in when he acquired convertible debentures and sold out when he disposed of conversion stock. Whether the words "sale" and "purchase" as used in section 16(b) also include the intermediate exchange of the convertible security for the conversion security is to us a debatable question of statutory construction, not foreclosed by any rationally inescapable meaning of the words used by Congress. Therefore, these words should be interpreted in the light of the objectives Congress sought to realize through this statute.

Congress indicated in the statute, and the courts have consistently recognized that the whole purpose of section 16(b) is to discourage corporate insiders from trading for short swing profits on the basis of information about corporate circumstances, plans and prospects not available to the public. Smolowe v. Delendo Corp., 2d Cir. 1943, 136 F.2d 231, 235, 148 A.L.R. 300, cert. denied 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446; Cook & Feldman, Insider Trading Under the Securities Exchange Act, 1953, 66 Harv.L. Rev. 385, 386–87. For this purpose Congress fashioned a provision compelling an insider to disgorge whatever profit he might acquire through short term—less than six months—in-and-out trading in his corporation's equity securities. It is in this context that Congress used the words "purchase" and "sale" to describe the terminal transactions of the prohibited trading. Therefore, it is relevant to consider, on the one hand, whether the intermediate conversion could accomplish such a change in the economic position of the security holder that he could

fairly be said to be taking a profit on his investment at that time, and, on the other, whether the decision to convert could possibly involve speculative judgment as to any trading advantage to be anticipated from acquiring common stock and subsequently selling it rather than convertible debentures. If not, the section 16(b) concepts of "sale" and "purchase" should not be construed as including such an exchange.

In circumstances such as we have here, the conversion affords the insider no opportunity either to realize a trading gain on speculative judgment exercised when the debentures were purchased or to exercise speculative judgment anew on the basis of inside information possessed at the time of conversion. The debentures were readily salable and were adequately protected against dilution both by their own provisions and by provisions of the underlying indenture. They would continue to be immediately convertible. Because of these features, the market price of the common would continue to be reflected fully in the market price commanded by the convertible security. There is no dispute about these facts. Actually, in terms of market economics, with which section 16(b) is concerned, the security holder, having surrendered his preferred position as a creditor, had less after converting than he had before. The compensating fact that his new position as stockholder was attended by new rights within the corporation—voting and dividend sharing, for example—was not a market or trading advantage and, therefore, is not relevant to our present problem. In the circumstances of this case, the continuing stable market relationship of convertible security and conversion security remains the decisive consideration against characterizing their exchange as a section 16(b) sale.

With reference to the question whether the conversion was a section 16(b) "purchase" of common stock, we have considered that the conversion might involve the exercise anew of speculative judgment if, despite price equivalence, a common stock could be sold more quickly than

could unlisted debentures. Such ability to sell quickly might be important to a speculatively minded insider preparing to trade upon any market influencing information which might become available to him only a very short time before public disclosure. But a convertible debenture holder could act as quickly as a stockholder and achieve the same result by selling shares on the exchange and at the same time so disposing of his equivalent convertible as to satisfy the statutory rule against short selling.[1]

The majority suggest one situation in which they think such a conversion as this may facilitate new speculation based on inside information. That is the situation in which a call has been made, or at least is known by the insider to be imminent, and the insider also knows of something likely to occur in the near future, such as the declaration of a large dividend, which probably will increase the market prices of the conversion security. In these circumstances, it is said that the insider might convert his debentures into stock with a view to selling the stock within a few months. He could not obtain the same advantage by retaining the debentures since it is premised that they have been or are about to be called.

Our concern here is only with the situation in which no call is made before or soon after conversion and the price of the convertible security maintains a specified stable and direct relationship to the price of the conversion security at all relevant times. The full benefit of any anticipated increase in the price of the conversion stock can as well be obtained by holding the convertible security as by exchanging it for the conversion security. If, as the majority suggest, the added fact of the issuance or imminence of a call would create some possibility of speculative conversion, there will be time enough to consider this contention, along with any other matters pertinent

to cases involving calls, when such a case is before us.

The foregoing considerations have led us to the conclusion that "sale" and "purchase" as used in section 16(b) should not be construed to include the exchange of securities involved in such a conversion as this case presents. We find support for our view of this case in the decision of the Court of Appeals for the Sixth Circuit in Ferraiolo v. Newman, 6th Cir., 1958, 259 F.2d 342, cert. denied 359 U.S. 927, 79 S.Ct. 606, 3 L.Ed.2d 629. The approach and reasoning of the Ferraiolo case are summarizd in the following excerpts from the opinion of Judge (now Mr. Justice) Stewart:

> "[T]he question is not in any event primarily a semantic one, but must be resolved in the light of the legislative purpose—to curb short swing speculation by insiders.
>
> " *   *   *
>
> "The standard that emerges  *   *   * [is] : Every transaction which can reasonably be defined as a purchase will be so defined, if the transaction is of a kind which can possibly lend itself to the speculation encompassed by Section 16(b)." 259 F.2d at 345.

It is also noteworthy that only a few months ago the Court of Appeals for the Ninth Circuit, considering a case essentially like ours, has reasoned the same way and has concluded that the conversion in its case was not a "purchase" of the conversion stock under section 16(b). Blau v. Max Factor & Co., 9th Cir. 1965, 342 F.2d 304.

The majority reject the approach to the conversion problem under section 16(b) in the Ferraiolo and Blau cases as "subjective", characterizing their own analysis, patterned after the Park & Tilford reasoning, as "objective". However, we think both approaches apply objective standards and tests. The choice, as we see it, is between "a rule of thumb"—as

---

1. While section 16(c) prohibits short sales by an insider of securities not owned by him, under the rules ᵒᶠ the Commission a person is deemed t ᵗ the security he sells if he owns and has tendered a security convertible into it. See 2 Loss, Securities Regulation, 2d ed. 1961, 1090, 1231–32.

the majority describe their solution—and a rule of reason designed to achieve a result that is both just and respectful of the legislative language and intendment.

Undoubtedly, in conversion situations that rule of reason imposes upon the judge who applies it the burden of determining from case to case the characteristics of the securities involved, the continuing relation of the convertible security to the conversion security, and what otherwise unattainable short term trading advantage, if any, might result from the exchange of the one for the other. But such sophisticated analysis is very often and properly required of a judge as he seeks to apply a statute in a way that is systematic, just and respectful of statutory language and manifest legisative will.

Accordingly, preferring the more discriminating analysis of Ferraiolo and Blau to a simplistic rule of thumb derived from Park & Tilford, we treat as decisive our reasoned conclusion that the conversion here was not such a transaction as could, in Judge Stewart's words "possibly lend itself to the speculation encompassed by Section 16(b)."

One other consideration requires brief comment. Section 16(b) authorizes the Securities and Exchange Commission to exempt transactions from the proscription of the section where in its expert judgment the exemption is consistent with the purpose of the legislation. It is arguable, therefore, that a court should construe the general prohibitory language as broadly as reason permits, leaving any narrowing to the expert judgment of the Commission. We think, however, that there is ample room for appropriate exercise of administrative judgment in situations where the possibility of profitable speculation based on inside information exists but seems too slight to require that such trading be prohibited,[2] or where what is indisputably a "purchase" and "sale" presents no such possibility. Perhaps some of the situations involving conversions after calls of convertible securities are appropriate for administrative exemption because the risk is small. But we are now considering a type of conversion in which the statutory language is not decisive and the danger with which section 16(b) is concerned seems nonexistent rather than small. We conclude, therefore, that the exchange accomplished in the present conversion involved neither a "purchase" nor a "sale" within the meaning of section 16(b). Of course, this conclusion involves no judgment whether such a transaction would be a purchase or a sale, or both, in any context other than section 16(b).

Finally, we agree with the other members of the court that the other separate grounds for reversal urged by the appellant are without merit, although if our view prevailed it would not be necessary to pass upon those contentions.

---

**2.** But see the dictum in Greene v. Dietz, 2d Cir. 1957, 247 F.2d 689, 692–694, followed in Perlman v. Timberlake, S.D.N.Y. 1959, 172 F.Supp. 246, but criticized in Meeker & Cooney, The Problem of Definition in Determining Insider Liabilities Under Section 16(b), 1959, 45 Va.L.Rev. 949, 971–975.